I
A
In March 2014, five months after Texas' admitting-privileges requirement forced the closure of half of that State's abortion clinics, Louisiana's Legislature began to hold hearings to consider a substantially identical proposal. Compare Whole Woman's Health , 579 U. S., at ---- - ----, 136 S.Ct., at 2299-2300, with June Medical Services LLC v. Kliebert , 250 F.Supp.3d 27, 53 (MD La. 2017) ; Record 11220. The proposal became law in mid-June 2014. 2014 La. Acts p. 2330.
As was true in Texas, Louisiana law already required abortion providers either to possess local hospital admitting privileges or to have a patient "transfer" arrangement with a physician who had such privileges. Compare Whole Woman's Health , 579 U. S., at ----, 136 S.Ct., at 2300 (citing Tex. Admin. Code, tit. 25, § 139.56 (2009) ), with former La. Admin. Code, tit. 48, pt. I, § 4407(A)(3) (2003), 29 La. Reg. 706-707 (2003). The new law eliminated that flexibility. Act 620 requires any doctor who performs abortions to hold "active admitting privileges at a hospital that is located not further than thirty miles from the location at which the abortion is performed or induced and that provides obstetrical or gynecological health care services." La. Rev. Stat. Ann. § 40:1061.10(A)(2)(a).
The statute defines "active admitting privileges" to mean that the doctor must be "a member in good standing" of the hospital's "medical staff ... with the ability to admit a patient and to provide diagnostic and surgical services to such patient." Ibid. ; La. Admin. Code, tit. 48, pt. I, § 4401. Failure to comply may lead to fines of up to $4,000 per violation, license revocation, and civil liability. See ibid. ; La. Rev. Stat. Ann. § 40:1061.29.
B
A few weeks before Act 620 was to take effect in September 2014, three abortion clinics and two abortion providers filed a lawsuit in Federal District Court. They alleged that Act 620 was unconstitutional because (among other things) it imposed an undue burden on the right of their patients to obtain an abortion. App. 24. The court later consolidated their lawsuit with a similar, separate action brought by two other clinics and two other abortion providers. (Like the courts below, we shall refer to the two doctors in the first case as Doe 1 and Doe 2; we shall refer to the two doctors in the second case as Doe 5 and Doe 6; and we shall refer to two other doctors then practicing in Louisiana as Doe 3 and Doe 4.)
The plaintiffs immediately asked the District Court to issue a temporary restraining order (TRO), followed by a preliminary injunction that would prevent the law from taking effect. June Medical Services LLC v. Caldwell , No. 14-cv-00525, 2014 WL 12923494 (MD La., Aug. 22, 2014), Doc. No. 5.
The State of Louisiana, appearing for the defendant Secretary of the Department *2114 of Health and Hospitals, filed a response that opposed the plaintiffs' TRO request. App. 32-39. But the State went on to say that, if the court granted the TRO or if the parties reached an agreement that would allow the plaintiffs time to obtain privileges without a TRO, the court should hold a hearing on the preliminary injunction request as soon as possible. Id. , at 43. The State argued that there was no reason to delay a ruling on the merits of the plaintiffs' undue-burden claims. Id ., at 43-44. It asserted that there was "no question that the physicians had standing to contest the law." Id. , at 44. And, in light of the State's "overriding interest in vindicating the constitutionality of its admitting-privileges law," the plaintiffs' suit was "the proper vehicle" to "remov[e] any cloud upon" Act 620's "validity." Id ., at 45.
The District Court declined to stay the Act's effective date. Instead, it provisionally forbade the State to enforce the Act's penalties, while directing the plaintiff doctors to continue to seek conforming privileges and to keep the court apprised of their progress. See TRO in No. 14-cv-00525, Doc. No. 31, pp. 2-3; see, e.g., App. 48-55, 64-82. These updates continued through the date of the District Court's decision. 250 F.Supp.3d at 77.
C
In June 2015, the District Court held a 6-day bench trial on the plaintiffs' request for a preliminary injunction. It heard live testimony from a dozen witnesses, including three Louisiana abortion providers, June Medical's administrator, the Secretary (along with a senior official) of the State's Department of Health and Hygiene, and three experts each for the plaintiffs and the State. Id., at 33-34. It also heard from several other witnesses via deposition. Ibid. Based on this evidentiary record, the court issued a decision in January 2016 declaring Act 620 unconstitutional on its face and preliminarily enjoining its enforcement. June Medical Services LLC v. Kliebert , 158 F.Supp.3d 473 (MD La.).
The State immediately asked the Court of Appeals for the Fifth Circuit to stay the District Court's injunction. The Court of Appeals granted that stay. But we then issued our own stay at the plaintiffs' request, thereby leaving the District Court's preliminary injunction (at least temporarily) in effect. See June Medical Services, L. L. C. v. Gee , 814 F.3d 319 (CA5), vacated, 577 U. S. ----, 136 S.Ct. 1354, 194 L.Ed.2d 254 (2016).
Approximately two months later, in June 2016, we issued our decision in Whole Woman's Health, reversing the Fifth Circuit's judgment in that case. We remanded this case for reconsideration, and the Fifth Circuit in turn remanded the case to the District Court permitting it to engage in further factfinding. See June Medical Services, L.L.C. v. Gee , 2016 WL 11494731 (CA5, Aug. 24, 2016) (per curiam ). All the parties agreed that the District Court could rule on the plaintiffs' request for a permanent injunction on the basis of the record it had already developed. Minute Entry in No. 14-cv-00525, Doc. No. 253. The court proceeded to do so.
D
Because the issues before us in this case primarily focus upon the factual findings (and fact-related determinations) of the District Court, we set forth only the essential findings here, giving greater detail in the analysis that follows.
With respect to the Act's asserted benefits, the District Court found that:
• "[A]bortion in Louisiana has been extremely safe, with particularly low rates of serious complications." 250 F.Supp.3d at 65. The "testimony of clinic staff and physicians demonstrated"
*2115 that it "rarely ... is necessary to transfer patients to a hospital: far less than once a year, or less than one per several thousand patients." Id., at 63. And "[w]hether or not a patient's treating physician has admitting privileges is not relevant to the patient's care." Id., at 64.
• There was accordingly " 'no significant health-related problem that the new law helped to cure.' The record does not contain any evidence that complications from abortion were being treated improperly, nor any evidence that any negative outcomes could have been avoided if the abortion provider had admitting privileges at a local hospital." Id., at 86. (quoting Whole Woman's Health , 579 U. S., at ----, 136 S.Ct., at 2311 ); see also 250 F.Supp.3d at 86-87 (summarizing conclusions).
• There was also "no credible evidence in the record that Act 620 would further the State's interest in women's health beyond that which is already insured under existing Louisiana law." Id., at 65.
Turning to Act 620's impact on women's access to abortion, the District Court found that:
• Approximately 10,000 women obtain abortions in Louisiana each year. Id., at 39. At the outset of this litigation, those women were served by six doctors at five abortion clinics. Id., at 40, 41-44. By the time the court rendered its decision, two of those clinics had closed, and one of the doctors (Doe 4) had retired, leaving only Does 1, 2, 3, 5, and 6. Ibid.
• "[N]otwithstanding the good faith efforts of Does 1, 2, 4, 5 and 6 to comply with the Act by getting active admitting privileges at a hospital within 30 miles of where they perform abortions, they have had very limited success for reasons related to Act 620 and not related to their competence." Id., at 78.
• These doctors' inability to secure privileges was "caused by Act 620 working in concert with existing laws and practices," including hospital bylaws and criteria that "preclude or, at least greatly discourage, the granting of privileges to abortion providers." Id., at 50.
• These requirements establish that admitting privileges serve no " 'relevant credentialing function' " because physicians may be denied privileges "for reasons unrelated to competency." Id., at 87 (quoting Whole Woman's Health , 579 U. S., at ----, 136 S.Ct., at 2313 ).
• They also make it "unlikely that the [a]ffected clinics will be able to comply with the Act by recruiting new physicians who have or can obtain admitting privileges." 250 F.Supp.3d at 82.
• Doe 3 testified credibly "that, as a result of his fears, and the demands of his private OB/GYN practice, if he is the last physician performing abortion in either the entire state or in the northern part of the state, he will not continue to perform abortions." Id., at 79 ; see also id., at 78-79 (summarizing that testimony).
• Enforcing the admitting-privileges requirement would therefore "result in a drastic reduction in the number and geographic distribution of abortion providers, reducing the number of clinics to one, or at most two, and leaving only one, or at most two, physicians providing abortions in the entire state," Does 3 and 5, who would only be allowed to practice in Shreveport and New Orleans.
*2116 Id., at 87. Depending on whether Doe 3 stopped practicing, or whether his retirement was treated as legally relevant, the impact would be a 55%-70% reduction in capacity. Id., at 81.
• "The result of these burdens on women and providers, taken together and in context, is that many women seeking a safe, legal abortion in Louisiana will be unable to obtain one. Those who can will face substantial obstacles in exercising their constitutional right to choose abortion due to the dramatic reduction in abortion services." Id., at 88 ; see id., at 79, 82, 87-88.
• In sum, "Act 620 does not advance Louisiana's legitimate interest in protecting the health of women seeking abortions. Instead, Act 620 would increase the risk of harm to women's health by dramatically reducing the availability of safe abortion in Louisiana." Id., at 87 ; see also id., at 65-66.
The District Court added that
"there is no legally significant distinction between this case and [ Whole Woman's Health ]: Act 620 was modeled after the Texas admitting privileges requirement, and it functions in the same manner, imposing significant obstacles to abortion access with no countervailing benefits." Id., at 88.
On the basis of these findings, the court held that Act 620 and its implementing regulations are unconstitutional. It entered an injunction permanently forbidding their enforcement.
E
The State appealed. A divided panel of the Court of Appeals reversed the District Court's judgment. The panel majority concluded that Act 620's impact was "dramatically less" than that of the Texas law invalidated in Whole Woman's Health . June Medical Services L. L. C. v. Gee , 905 F.3d 787, 791 (CA5 2018). "Despite its diligent effort to apply [ Whole Woman's Health ] faithfully," the majority thought that the District Court had "clearly erred in concluding otherwise." Id., at 815.
With respect to the Act's asserted benefits, the majority thought that, "[u]nlike Texas, Louisiana presents some evidence of a minimal benefit." Id., at 805. Rejecting the District Court's contrary finding, it concluded that the admitting-privileges requirement "performs a real, and previously unaddressed, credentialing function that promotes the wellbeing of women seeking abortion." Id., at 806. The majority believed that the process of obtaining privileges would help to "verify an applicant's surgical ability, training, education, experience, practice record, and criminal history." Id., at 805, and n. 53. And it accepted the State's argument that the law "brings the requirements regarding outpatient abortion clinics into conformity with the preexisting requirement that physicians at ambulatory surgical centers ('ASCs') must have privileges at a hospital within the community." Id., at 805.
Moving on to Act 620's burdens, the appeals court wrote that "everything turns on whether the privileges requirement actually would prevent doctors from practicing in Louisiana." Id., at 807. Although the State challenged the District Court's findings only with respect to Does 2 and 3, the Court of Appeals went further. It disagreed with nearly every one of the District Court's findings, concluding that "the district court erred in finding that only Doe 5 would be able to obtain privileges and that the application process creates particular hardships and obstacles for abortion providers in Louisiana." Id., at 810. The court noted that "[a]t least three hospitals have proven willing to extend privileges." Ibid. It thought that "only Doe 1 has put forth a *2117 good-faith effort to get admitting privileges," while "Doe 2, Doe 5, and Doe 6 could likely obtain privileges," ibid. , and "Doe 3's personal choice to stop practicing cannot be legally attributed to Act 620," id., at 811.
Having rejected the District Court's findings with respect to all but one of the physicians, the Court of Appeals concluded that "there is no evidence that Louisiana facilities will close from Act 620." Id., at 810. The appeals court allowed that the Baton Rouge clinic where Doe 5 had not obtained privileges would close. But it reasoned that "[b]ecause obtaining privileges is not overly burdensome, ... the fact that one clinic would have to close is not a substantial burden that can currently be attributed to Act 620 as distinguished from Doe 5's failure to put forth a good faith effort." Ibid. The Court of Appeals added that the additional work that Doe 2 and Doe 3 would have to do to compensate for Doe 1's inability to perform abortions "does not begin to approach the capacity problem in" Whole Woman's Health . 905 F.3d at 812. It estimated that Act 620 would "resul[t] in a potential increase" in waiting times "of 54 minutes at one of the state's clinics for at most 30% of women." Id., at 815.
On the basis of these findings, the panel majority concluded that Louisiana's admitting-privileges requirement would impose no "substantial burden at all" on Louisiana women seeking an abortion, "much less a substantial burden on a large fraction of women as is required to sustain a facial challenge." Ibid. Judge Higginbotham dissented.
The Court of Appeals denied the plaintiffs' petition for en banc rehearing over dissents by Judges Dennis and Higginson, joined by four of their colleagues. See June Medical Services, L. L. C. v. Gee , 913 F.3d 573 (CA5 2019) (per curiam ). The plaintiffs then asked this Court to stay the Fifth Circuit's judgment. We granted their application, thereby allowing the District Court's injunction to remain in effect. June Medical Services, L. L. C. v. Gee , 586 U. S. ----, 139 S.Ct. 663, 203 L.Ed.2d 143 (2019). The plaintiffs subsequently filed a petition for certiorari addressing the merits of the appeals court's decision. The State filed a cross-petition, challenging the plaintiffs' authority to maintain this action. We granted both petitions.
II
We initially consider a procedural argument that the State raised for the first time in its cross-petition for certiorari. As we have explained, the plaintiff abortion providers and clinics in this case have challenged Act 620 on the ground that it infringes their patients' rights to access an abortion. The State contends that the proper parties to assert these rights are the patients themselves. We think that the State has waived that argument.
The State's argument rests on the rule that a party cannot ordinarily " 'rest his claim to relief on the legal rights or interests of third parties.' " Kowalski v. Tesmer , 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (quoting Warth v. Seldin , 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ). This rule is "prudential." 543 U.S. at 128-129, 125 S.Ct. 564. It does not involve the Constitution's "case-or-controversy requirement." Id., at 129, 125 S.Ct. 564 ; see Craig v. Boren , 429 U.S. 190, 193, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) ; Singleton v. Wulff , 428 U.S. 106, 112, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). And so, we have explained, it can be forfeited or waived. See Craig , 429 U.S. at 193-194, 97 S.Ct. 451.
As we pointed out, supra, at 2113 - 2114, the State's memorandum opposing the *2118 plaintiffs' TRO request urged the District Court to proceed swiftly to the merits of the plaintiffs' undue-burden claim. It argued that there was "no question that the physicians had standing to contest" Act 620. App. 44. And it told the District Court that the Fifth Circuit had found that doctors challenging Texas' "identical" law "had third-party standing to assert their patients' rights." Id., at 43-44. Noting that the Texas law had "already been upheld," the State asserted that it had "a keen interest in removing any cloud upon the validity of its law." Id., at 45. It insisted that this suit was "the proper vehicle to do so." Ibid. The State did not mention its current objection until it filed its cross-petition-more than five years after it argued that the plaintiffs' standing was beyond question.
The State's unmistakable concession of standing as part of its effort to obtain a quick decision from the District Court on the merits of the plaintiffs' undue-burden claims bars our consideration of it here. See Wood v. Milyard , 566 U.S. 463, 474, 132 S.Ct. 1826, 182 L.Ed.2d 733 (2012) ; cf. post, at 2165 - 2166 (ALITO, J., dissenting) (addressing the Court's approach to claims forfeited, rather than waived); post , at 2174 - 2175 (GORSUCH, J., dissenting) (addressing waiver of structural rather than prudential objections).
The State refers to the Fifth Circuit's finding of standing in Whole Woman's Health as an excuse for its concession. Brief for Respondent in No. 181323, p. 52 (Brief for Respondent). But the standing argument the State makes here rests on reasons that it tells us are specific to abortion providers in Louisiana . See id., at 41-48. We are not persuaded that the State could have thought it was precluded from making those arguments by a decision with respect to Texas doctors.
And even if the State had merely forfeited its objection by failing to raise it at any point over the last five years, we would not now undo all that has come before on that basis. What we said some 45 years ago in Craig applies equally today: "[A] decision by us to forgo consideration of the constitutional merits"-after "the parties have sought or at least have never resisted an authoritative constitutional determination" in the courts below-"in order to await the initiation of a new challenge to the statute by injured third parties would be impermissibly to foster repetitive and time-consuming litigation under the guise of caution and prudence." 429 U.S. at 193-194, 97 S.Ct. 451 (quotation altered).
In any event, the rule the State invokes is hardly absolute. We have long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations. See, e.g., Whole Woman's Health , 579 U. S., at ----, 136 S.Ct., at 2314 ; Gonzales , 550 U.S. at 133, 127 S.Ct. 1610 ; Ayotte v. Planned Parenthood of Northern New Eng. , 546 U.S. 320, 324, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) ; Stenberg v. Carhart , 530 U.S. 914, 922, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) ; Mazurek v. Armstrong , 520 U.S. 968, 969-970, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam ); Casey , 505 U.S. at 845, 112 S.Ct. 2791 (majority opinion); Akron v. Akron Center for Reproductive Health, Inc. , 462 U.S. 416, 440, n. 30, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) ; Planned Parenthood of Central Mo. v. Danforth , 428 U.S. 52, 62, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) ; Doe v. Bolton , 410 U.S. 179, 188-189, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).
And we have generally permitted plaintiffs to assert third-party rights in cases where the " 'enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties'
*2119 rights.' " Kowalski , 543 U.S. at 130, 125 S.Ct. 564 (quoting Warth , 422 U.S. at 510, 95 S.Ct. 2197 ); see, e.g. , Department of Labor v. Triplett , 494 U.S. 715, 720, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990) (Scalia, J., for the Court) (attorney raising rights of clients to challenge restrictions on fee arrangements); Craig , 429 U.S. at 192, 97 S.Ct. 451 (convenience store raising rights of young men to challenge sex-based restriction on beer sales); Doe , 410 U.S. at 188, 93 S.Ct. 739 (abortion provider raising the rights of pregnant women to access an abortion); Carey v. Population Services Int'l , 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (distributors of contraceptives raising rights of prospective purchasers to challenge restrictions on sales of contraceptives); Eisenstadt v. Baird , 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (similar); Griswold v. Connecticut , 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (similar); Sullivan v. Little Hunting Park, Inc. , 396 U. S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (white property owner raising rights of black contractual counterparty to challenge discriminatory restrictions on ability to contract); Barrows v. Jackson , 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) (similar). In such cases, we have explained, "the obvious claimant" and "the least awkward challenger" is the party upon whom the challenged statute imposes "legal duties and disabilities." Craig , 429 U.S. at 196-197, 97 S.Ct. 451 ; see Akron , 462 U.S. at 440, n. 30, 103 S.Ct. 2481 ; Danforth , 428 U.S. at 62, 96 S.Ct. 2831 ; Doe , 410 U.S. at 188, 93 S.Ct. 739.
The case before us lies at the intersection of these two lines of precedent. The plaintiffs are abortion providers challenging a law that regulates their conduct. The "threatened imposition of governmental sanctions" for noncompliance eliminates any risk that their claims are abstract or hypothetical. Craig , 429 U.S. at 195, 97 S.Ct. 451. That threat also assures us that the plaintiffs have every incentive to "resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." Ibid. And, as the parties who must actually go through the process of applying for and maintaining admitting privileges, they are far better positioned than their patients to address the burdens of compliance. See Singleton , 428 U.S. at 117, 96 S.Ct. 2868 (plurality opinion) (observing that "the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against," a woman's decision to have an abortion). They are, in other words, "the least awkward" and most "obvious" claimants here. Craig , 429 U.S. at 197, 97 S.Ct. 451.
Our dissenting colleagues suggest that this case is different because the plaintiffs have challenged a law ostensibly enacted to protect the women whose rights they are asserting. See post, at 2166 - 2167 (opinion of ALITO, J.); post , at 2174 (opinion of GORSUCH, J.). But that is a common feature of cases in which we have found third-party standing. The restriction on sales of 3.2% beer to young men challenged by a drive-through convenience store in Craig was defended on "public health and safety grounds," including the premise that young men were particularly susceptible to driving while intoxicated. 429 U.S. at 199-200, 97 S.Ct. 451 ; see Hager, Gender Discrimination and the Courts: New Ground to Cover, Washington Post, Sept. 26, 1976, p. 139. And the rule requiring approval from the Department of Labor for attorney fee arrangements challenged by a lawyer in Triplett was "designed to protect [their clients] from their improvident contracts, in the interest not only of themselves and their families but of the public."
*2120 494 U.S. at 722, 110 S.Ct. 1428 (internal quotation marks omitted).
Nor is this the first abortion case to address provider standing to challenge regulations said to protect women. Both the hospitalization requirement in Akron , 462 U.S. at 435, 103 S.Ct. 2481, and the hospital-accreditation requirement in Doe , 410 U.S. at 195, 93 S.Ct. 739, were defended as health and safety regulations. And the ban on saline amniocentesis in Danforth was based on the legislative finding "that the technique is deleterious to maternal health." 428 U.S. at 76, 96 S.Ct. 2831 (internal quotation marks omitted).
In short, the State's strategic waiver and a long line of well-established precedents foreclose its belated challenge to the plaintiffs' standing. We consequently proceed to consider the merits of the plaintiffs' claims.
III
A
Turning to the merits, we apply the constitutional standards set forth in our earlier abortion-related cases, and in particular in Casey and Whole Woman's Health . At the risk of repetition, we remind the reader of the standards we described above. In Whole Woman's Health , we quoted Casey in explaining that " 'a statute which, while furthering [a] valid state interest has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.' " 579 U. S., at ----, 136 S.Ct., at 2309 (quoting Casey , 505 U.S. at 877, 112 S.Ct. 2791 (plurality opinion)). We added that " '[u]nnecessary health regulations' " impose an unconstitutional " 'undue burden' " if they have " 'the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion.' " 579 U. S., at ----, 136 S.Ct., at 2309 (quoting Casey , 505 U.S. at 878, 112 S.Ct. 2791 ; emphasis added).
We went on to explain that, in applying these standards, courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer." 579 U. S., at ---- - ----, 136 S.Ct., at 2324. We cautioned that courts "must review legislative 'factfinding under a deferential standard.' " Id., at ----, 136 S.Ct., at 2310 (quoting Gonzales , 550 U.S. at 165, 127 S.Ct. 1610 ). But they "must not 'place dispositive weight' on those 'findings,' " for the courts " 'retai[n] an independent constitutional duty to review factual findings where constitutional rights are at stake.' " 579 U. S., at ----, 136 S.Ct., at 2310 (quoting Gonzales , 550 U.S. at 165, 127 S.Ct. 1610 ; emphasis deleted).
We held in Whole Woman's Health that the trial court faithfully applied these standards. It "considered the evidence in the record-including expert evidence, presented in stipulations, depositions, and testimony." 579 U. S., at ----, 136 S.Ct., at 2310. It "then weighed the asserted benefits" of the law "against the burdens" it imposed on abortion access. Ibid. And it concluded that the balance tipped against the statute's constitutionality. The District Court in this suit did the same.
B
The Court of Appeals disagreed with the District Court, not so much in respect to the legal standards that we have just set forth, but because it did not agree with the factual findings on which the District Court relied in assessing both the burdens that Act 620 imposes and the health-related benefits it might bring. Compare, e.g., supra, at 2114 - 2116, with supra, at 2116 - 2117. We have consequently reviewed the record in detail ourselves. In doing so, we *2121 have applied well-established legal standards.
We start from the premise that a district court's findings of fact, "whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. Rule Civ. Proc. 52(a)(6). In " 'applying [this] standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. ' " Anderson v. Bessemer City , 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc. , 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) ). Where "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson, 470 U.S. at 573-574, 105 S.Ct. 1504. "A finding that is 'plausible' in light of the full record-even if another is equally or more so-must govern." Cooper v. Harris , 581 U. S. ----, ----, 137 S.Ct. 1455, 1465, 197 L.Ed.2d 837 (2017).
Our dissenting colleagues suggest that a different, less-deferential standard should apply here because the District Court enjoined the admitting-privileges requirement before it was enforced. See post , at 2158 - 2159 (opinion of ALITO, J.); post , at 2176 - 2178 (opinion of GORSUCH, J.). We are aware of no authority suggesting that appellate scrutiny of factual determinations varies with the timing of a plaintiff's lawsuit or a trial court's decision. And, in any event, the record belies the dissents' claims that the District Court's findings in this case were "conjectural" or premature. As we have explained, the District Court's order on the plaintiffs' motion for a temporary restraining order suspended only Act 620's penalties. The plaintiffs were required to continue in their efforts to obtain admitting privileges. See supra, at 2114. The District Court supervised those efforts through the trial and beyond. See 250 F.Supp.3d at 77. It based its findings on this real-world evidence, not speculative guesswork. Nor can we agree with the suggestion that the timing of the District Court's decision somehow prejudiced the State. From the start, the State urged that the District Court decide the merits of the plaintiffs' claims without awaiting a decision on their applications for admitting privileges. See App. 43-44. And, when this case returned to the District Court in August 2016, following our decision in Whole Woman's Health , the State stipulated that the case was ripe for decision on the record as it stood in June 2015. See supra, at 2114 - 2115. In short, we see no legal or practical basis to depart from the familiar standard that applies to all "[f]indings of fact." Fed. Rule Civ. Proc. 52(a).
Under that familiar standard, we find that the testimony and other evidence contained in the extensive record developed over the 6-day trial support the District Court's ultimate conclusion that, "[e]ven if Act 620 could be said to further women's health to some marginal degree, the burdens it imposes far outweigh any such benefit, and thus the Act imposes an unconstitutional undue burden." 250 F.Supp.3d at 88.
IV
The District Court's Substantial-Obstacle Determination
The District Court found that enforcing the admitting-privileges requirement *2122 would "result in a drastic reduction in the number and geographic distribution of abortion providers." Id., at 87. In light of demographic, economic, and other evidence, the court concluded that this reduction would make it impossible for "many women seeking a safe, legal abortion in Louisiana ... to obtain one" and that it would impose "substantial obstacles" on those who could. Id., at 88. We consider each of these findings in turn.
A
Act 620's Effect on Abortion Providers
We begin with the District Court's findings in respect to Act 620's impact on abortion providers. As we have said, the court found that the Act would prevent Does 1, 2, and 6 from providing abortions. And it found that the Act would bar Doe 5 from working in his Baton Rouge-based clinic, relegating him to New Orleans. See supra, at 2115 - 2116.
1
In Whole Woman's Health , we said that, by presenting "direct testimony" from doctors who had been unable to secure privileges, and "plausible inferences to be drawn from the timing of the clinic closures" around the law's effective date, the plaintiffs had "satisfied their burden" to establish that the Texas admitting-privileges requirement caused the closure of those clinics. 579 U. S., at ----, 136 S.Ct., at 2313.
We wrote that these inferences were bolstered by the submissions of amici in the medical profession, which "describe[d] the undisputed general fact that hospitals often" will restrict admitting privileges to doctors likely to seek a "certain number of admissions per year." Id., at ----, 136 S.Ct., at 2312 (internal quotation marks omitted). The likely effect of such requirements was that abortion providers "would be unable to maintain admitting privileges or obtain those privileges for the future, because the fact that abortions are so safe meant that providers were unlikely to have any patients to admit." Id ., at ----, 136 S.Ct., at 2312. We also referred to "common prerequisites to obtaining admitting privileges that have nothing to do with ability to perform medical procedures"; for example, requirements that doctors have "treated a high number of patients in the hospital setting in the past year, clinical data requirements, residency requirements, and other discretionary factors." Ibid.
To illustrate how these criteria impacted abortion providers, we noted the example of an obstetrician with 38 years' experience who had been denied admitting privileges for reasons " 'not based on clinical competence considerations.' " Ibid. This, we said, showed that the law served no "relevant credentialing function," but prevented qualified providers from serving women who seek an abortion. Id., at ----, 136 S.Ct., at 2313. And that, in turn, "help[ed] to explain why the new [law's admitting-privileges] requirement led to the closure of " so many Texas clinics. Id., at ----, 136 S.Ct., at 2313.
The evidence on which the District Court relied in this case is even stronger and more detailed. The District Court supervised Does 1, 2, 5, and 6 for over a year and a half as they tried, and largely failed, to obtain conforming privileges from 13 relevant hospitals. See 250 F.Supp.3d at 77-78 ; App. 48-55, 64-82. The court heard direct evidence that some of the doctors' applications were denied for reasons that had nothing to do with their ability to perform abortions safely. 250 F.Supp.3d at 68-70, 76-77 ; App. 1310, 1435-1436. It also compiled circumstantial evidence that explains why other applications were denied and explains why, given the costs of applying *2123 and the reputational risks that accompany rejection, some providers could have chosen in good faith not to apply to every qualifying hospital. Id., at 1135, 1311 (discussing the costs associated with unsuccessful applications). That circumstantial evidence includes documents and testimony that described the processes Louisiana hospitals follow when considering applications for admitting privileges, including requirements like the ones we cited in Whole Woman's Health that are unrelated to a doctor's competency to perform abortions. See generally Brief for Medical Staff Professionals as Amici Curiae 11-30 (reviewing the hospital bylaws in the record).
The evidence shows, among other things, that the fact that hospital admissions for abortion are vanishingly rare means that, unless they also maintain active OB/GYN practices, abortion providers in Louisiana are unlikely to have any recent in-hospital experience. 250 F.Supp.3d at 49. Yet such experience can well be a precondition to obtaining privileges. Doe 2, a board-certified OB/GYN with nearly 40 years' experience, testified that he had not "done any in-hospital work in ten years" and that just two of his patients in the preceding 5 years had required hospitalization. App. 387, 400. As a result, he was unable to comply with one hospital's demand that he produce data on "patient admissions and management, consultations and procedures performed" in-hospital before his application could be "processed." Id., at 1435; see id., at 437-438. Doe 1, a board-certified family doctor with over 10 years' experience, was similarly unable to "submit documentation of hospital admissions and management of patients." Id., at 1436.
The evidence also shows that many providers, even if they could initially obtain admitting privileges, would be unable to keep them. That is because, unless they have a practice that requires regular in-hospital care, they will lose the privileges for failing to use them. Doe 6, a board-certified OB/GYN practitioner with roughly 50 years' experience, provides only medication abortions. Id., at 1308. Of the thousands of women he served over the decade before the District Court's decision, during which he also performed surgical abortions, just two required a direct transfer to a hospital and one of them was treated without being admitted. Id., at 1309. That safety record would make it impossible for Doe 6 to maintain privileges at any of the many Louisiana hospitals that require newly appointed physicians to undergo a process of "focused professional practice evaluation," in which they are observed by hospital staff as they perform in-hospital procedures. See Record 2635, 2637, 2681, 9054; Brief for Medical Staff Professionals as Amici Curiae 28-29 (describing this practice); cf. Record 10755 (requiring an "on-going review" of practice "in the Operating Room"). And it would likewise disqualify him at hospitals that require physicians to admit a minimum number of patients, either initially or on an ongoing basis. See, e.g., id., at 9040, 9068-9069, 9150-9153; cf. App. 1193, 1182 (provider with no patient contacts in first year assigned to "Affiliate" status, without admitting privileges).
The evidence also shows that opposition to abortion played a significant role in some hospitals' decisions to deny admitting privileges. 250 F.Supp.3d at 48-49, 51-53 (collecting evidence). Some hospitals expressly bar anyone with privileges from performing abortions. App. 1180, 1205. Others are unwilling to extend privileges to abortion providers as a matter of discretion. Id., at 1127-1129. For example, Doe 2 testified that he was told not to bother asking for admitting privileges at University Health in Shreveport because of his abortion work. Id., at 383-384. And Doe 1 *2124 was told that his abortion work was an impediment to his application. Id., at 1315-1316.
Still other hospitals have requirements that abortion providers cannot satisfy because of the hostility they face in Louisiana. Many Louisiana hospitals require applicants to identify a doctor (called a "covering physician") willing to serve as a backup should the applicant admit a patient and then for some reason become unavailable. See Record 9154, 9374, 9383, 9478, 9667, 10302, 10481, 10637, 10659-10661, 10676. The District Court found "that opposition to abortion can present a major, if not insurmountable hurdle, for an applicant getting the required covering physician." 250 F.Supp.3d at 49 ; cf. Whole Woman's Health , 579 U. S., at ----, 136 S.Ct., at 2313 (citing testimony describing similar problems faced by Texas providers seeking covering physicians). Doe 5 is a board-certified OB/GYN who had been practicing for more than nine years at the time of trial. Of the thousands of abortions he performed in the three years prior to the District Court's decision, not one required a direct transfer to a hospital. App. 1134. Yet he was unable to secure privileges at three Baton Rouge hospitals because he could not find a covering physician willing to be publicly associated with an abortion provider. Id., at 1335-1336. Doe 3, a board-certified OB/GYN with nearly 45 years of experience, testified that he, too, had difficulty arranging coverage because of his abortion work. Id., at 200-202.
Just as in Whole Woman's Health , the experiences of the individual doctors in this case support the District Court's factual finding that Louisiana's admitting-privileges requirement, like that in Texas' law, serves no " 'relevant credentialing function.' " 250 F.Supp.3d at 87 (quoting Whole Woman's Health , 579 U. S., at ----, 136 S.Ct., at 2313 ).
2
The Court of Appeals found another explanation for the doctors' inability to obtain privileges more compelling. It conceded that Doe 1 would not be able to obtain admitting privileges in spite of his good-faith attempts. It concluded, however, that Does 2, 5, and 6 had acted in bad faith. 905 F.3d at 807. The problem is that the law requires appellate courts to review a trial court's findings under the deferential clear-error standard we have described. See supra, at 2120 - 2121. Our review of the record convinces us that the Court of Appeals misapplied that standard.
Justice ALITO does not dispute that the District Court's findings are not "clearly erroneous." He argues instead that both the District Court and the Court of Appeals applied the wrong legal standard to the record in this case. By asking whether the doctors acted in "good faith," he contends, the courts below failed to account for the doctors' supposed "incentive to do as little as" possible to obtain conforming privileges. Post , at 2158 - 2160 (dissenting opinion); cf. post, at 2176 - 2177 (GORSUCH, J., dissenting). But that is not a legal argument at all. It is simply another way of saying that the doctors acted in bad faith. The District Court, after monitoring the doctors' efforts for a year and a half, found otherwise. And "[w]hen the record is examined in light of the appropriately deferential standard, it is apparent that it contains nothing that mandates a finding that the District Court's conclusion was clearly erroneous." Anderson , 470 U.S. at 577, 105 S.Ct. 1504.
Doe 2
The District Court found that Doe 2 tried in good faith to get admitting privileges within 30 miles of his Shreveport-area *2125 clinic. 250 F.Supp.3d at 68. The Court of Appeals thought that conclusion clearly erroneous for three reasons.
First, the appeals court suggested that Doe 2 failed to submit the data needed to process his application to Bossier's Willis-Knighton Health Center. 905 F.3d at 808. It is true that Doe 2 submitted no additional information in response to the last letter he received from Willis-Knighton. But the record explains that failure. Doe 2 reasonably believed there was no point in doing so. The hospital's letter explained that the data Doe 2 had already "submitted supports the outpatient [abortion] procedures you perform[ed]." App. 1435. But, the letter added, this data did "not support your request for hospital privileges" because it did not allow the hospital to "evaluate patient admissions and management, consultations, and procedures performed." Ibid. Doe 2 testified at trial that he understood this to mean that he would have to submit records of hospital admissions, even though he had not "done any in-hospital work in ten years." Id., at 387; see id., at 437 ("I've explained that that information doesn't exist"). Doe 2's understanding was consistent with Willis-Knighton's similar letter to Doe 1, which explicitly stated that "we require that you submit documentation of hospital admissions and management of patients ...." Id., at 1436. The record also shows that Doe 2 could not have maintained the "adequate number of inpatient contacts" Willis-Knighton requires to support continued privileges. Record 9640; see App. 387-390, 404. Justice ALITO faults Doe 2 for failing to pursue an application for "courtesy staff" privileges. See post, at 2162 - 2163. For one thing, it is far from clear that courtesy privileges entitle a physician to admit patients, as Act 620 requires. Compare, e.g., Record 9640 with id., at 9643. For another, that would not solve the problem that Doe 2 lacked the required in-hospital experience. Justice ALITO wonders whether Willis-Knighton might have conferred courtesy privileges even without that experience. But the factors the hospital considers for both tiers of privileges are facially identical. Id., at 9669. We have no license to reverse a trial court's factual findings based on speculative inferences from facts not in evidence.
Second, the Court of Appeals found Doe 2's explanation that Christus Schumpert Hospital "would not staff an abortion provider" to be "blatantly contradicted by the record." 905 F.3d at 808. The record, however, contains Christus' bylaws. They state that "[n]o activity prohibited by" the Ethical and Religious Directives to which the hospital subscribes "shall be engaged in by any Medical Staff appointee or any other person exercising clinical privileges at the Health System." App. 1180. These directives provide that abortion "is never permitted." Id., at 1205. And they warn against "the danger of scandal in any association with abortion providers." Ibid .
The State suggests that the Court of Appeals, in speaking of a "contradic[tion]," was referring to the fact that Doe 3 had admitting privileges at Christus, as had Doe 2 at an earlier time. Brief for Respondent 75. Doe 3 testified, however, that he did not know whether Christus was "aware that I was performing abortions" and that he did not "feel like testing the waters there"-i.e., by "asking [Christus] how they would feel" if they were aware that he "was performing abortions." App. 273. And nothing in the record suggests that Christus, 10 years earlier, was aware of Doe 2's connection with abortion. Justice ALITO imagines a number of ways that Christus may have become aware of Doe 2 or Doe 3's abortion practice. See post, at 2161 - 2162, and n. 10 (dissenting opinion). The State apparently did not see fit to test these theories or probe the doctors' accounts *2126 on cross-examination, however. And the District Court's finding of good faith is plainly permissible on the record before us.
Finally, the Court of Appeals faulted Doe 2 for failing to apply to Minden Hospital. The record also explains that decision. Minden subjects all new appointees to "not less than" six months of "focused professional practice evaluation." Record 9281; see also id., at 9252. That evaluation requires an assessment of the provider's in-hospital work. See supra, at 2123 - 2124. Doe 2 could not meet that requirement because, as we have said, Doe 2 does not do in-hospital work, and only two of his patients in the past five years have required hospitalization. App. 400. Moreover, Minden's bylaws express a preference for applicants whom "members of the current Active Staff of the Hospital" have recommended. Id., at 1211. Doe 2 testified that Minden Hospital was "a smaller hospital," "very close to the [geographic] limits," where he "[did]n't really know anyone." Id., at 454. He applied to those hospitals where he believed he had the highest likelihood of success. Ibid. Given this evidence, the Fifth Circuit was wrong to conclude that the District Court's findings in respect to Doe 2 were "clearly erroneous." See Anderson , 470 U.S. at 575, 105 S.Ct. 1504.
Doe 5
The District Court found that Doe 5 was unable to obtain admitting privileges at three hospitals in range of his Baton Rouge clinic in spite of his good-faith efforts to satisfy each hospital's requirement that he find a covering physician. 250 F.Supp.3d at 76 ; see App. 1334-1335 (Women's Hospital); Record 2953 (Baton Rouge General), 10659-10661 (Lane Regional). The Court of Appeals disagreed. It thought that Doe 5's efforts reflected a "lackluster approach" because he asked only one doctor to cover him. 905 F.3d at 809.
The record shows, however, that Doe 5 asked the doctor most likely to respond affirmatively: the doctor with whom Doe 5's Baton Rouge clinic already had a patient transfer agreement. App. 1135. Yet Doe 5 testified that even this doctor was "too afraid to be my covering physician at the hospital" because, while the transfer agreement could apparently be "kept confidential," he feared that an agreement to serve as a covering physician would not remain a secret. Id., at 1135-1136. And, if the matter became well known, the doctor whom Doe 5 asked worried that it could make him a target of threats and protests. Ibid .
Doe 5 was familiar with the problem. Anti-abortion protests had previously forced him to leave his position as a staff member of a hospital northeast of Baton Rouge. Id., at 1137-1138, 1330. And activists had picketed the school attended by the children of a former colleague, who then stopped performing abortions as a result. Record 14036-14037.
With his own experience and their existing relationship in mind, Doe 5 could have reasonably thought that, if this doctor wouldn't serve as his covering physician, no one would. And it was well within the District Court's discretion to credit that reading of the record. Cf. Cooper , 581 U. S., at ----, 137 S.Ct., at 1465. Doe 5's testimony was internally consistent and consistent with what the District Court called the "mountain of un-contradicted and un-objected to evidence" in the record that supported its general finding "that opposition to abortion can present a major, if not insurmountable hurdle, for an applicant getting the required covering physician," including Doe 3's similar experience. 250 F.Supp.3d at 51, 49 ; see id., at 51-53 ; App. 200-202.
*2127 The Court of Appeals did not address this general finding or the evidence the District Court relied on to support it, and neither do our dissenting colleagues. Cf. post , at 2163 - 2164 (opinion of ALITO, J.); post , at 2177 (opinion of GORSUCH, J.). The Court of Appeals pointed to what it described as Doe 4's testimony that "finding a covering physician is not overly burdensome." 905 F.3d at 809. Doe 4's actual testimony was that he did not believe requiring doctors to obtain a covering physician was "an overburdensome requirement for admitting privileges." Record 14154. In context, that statement is most naturally read as saying that such a requirement was reasonable, not that it was easy to fulfill. In fact, Doe 4 testified that he had been unable to apply to two hospitals for admitting privileges because he could not find a covering physician. Id., at 14154-14155. Moreover, Doe 4's statement referred to his efforts to obtain admitting privileges in New Orleans, not in Baton Rouge. Ibid. Doe 5 testified that he could more easily find a covering physician in New Orleans (where he did obtain privileges) because attitudes toward abortion there were less hostile than in Baton Rouge, so the doctors' testimony would be consistent even under the Fifth Circuit's view. App. 1335-1336. Once again, the appeals court's conclusion cannot be squared with the standard of review. Cf. Anderson , 470 U.S. at 575, 105 S.Ct. 1504.
Doe 6
Finally, the District Court found that, notwithstanding his good-faith efforts, Doe 6 would not be able to obtain admitting privileges within 30 miles of the clinic in New Orleans where he worked. The Court of Appeals did not question Doe 6's decision not to apply to Tulane Hospital. Nor did it take issue with the District Court's finding that his application to East Jefferson Hospital had been denied de facto through no fault of his own. 250 F.Supp.3d at 77 ; App. 54. But the appeals court reversed the District Court's finding on the ground that Doe 6 should have (but did not) apply for admitting privileges at seven other hospitals in New Orleans, including Touro Hospital, which had granted limited privileges to Doe 5. 905 F.3d at 809-810.
Doe 6 testified that he did not apply to other hospitals because he did not admit a sufficient number of patients to receive active admitting privileges. App. 1310. As we have explained, supra, at 2122 - 2124, Doe 6 provides only medication abortions involving no surgical intervention. See App. 1308. The State 's own admitting-privileges expert, Dr. Robert Marier, testified that a doctor in Doe 6's position would "probably not" be able to obtain "active admitting and surgical privileges" at any hospital. Id., at 884; see 250 F.Supp.3d at 44 (finding Dr. Marier "generally well qualified" to express an opinion on "the issue of admitting privileges and hospital credentialing").
The record contains the bylaws of four of the seven hospitals to which the Court of Appeals referred. All four directly support the testimony of Doe 6 and the State's expert. Three hospitals require doctors who receive admitting privileges to undergo a process of "focused professional practice evaluation." See Record 2635, 2637, 2681 (Touro Hospital), 9054 (New Orleans East Hospital), 10755 (East Jefferson Hospital). As we have explained, this evaluation requires hospital staff to observe a doctor with admitting privileges while he or she performs a certain number of procedures. See supra, at 2123 - 2124. If the doctor admits no patients (and Doe 6 has no patients requiring admission), there is nothing to observe. Another hospital requires physicians to admit a minimum number of patients, either initially or after *2128 receiving admitting privileges. Record 9150-9153 (West Jefferson Hospital). And one requires both. Id., at 9040, 9069 (New Orleans East Hospital). The record apparently is silent as to the remaining three hospitals, but that silence cannot contradict the well-supported testimony of Doe 6 and the State's expert that Doe 6 would not receive admitting privileges from any of them. Good faith does not require an exercise in futility.
We recognize that Doe 5 was able to secure limited admitting privileges at Touro Hospital, to which Doe 6 did not apply. But, unlike Doe 6, Doe 5 primarily performs surgical abortions. App. 1330. And while Doe 5 was a hospital-based physician as recently as 2012, Doe 6 has not held privileges at any hospital since 2005. Id., at 1310, 1329. Doe 5's success therefore does not directly contradict the evidence that we have described in respect to Doe 6 or render the District Court's conclusion as to Doe 6 clearly erroneous. And, as we have said, "[a] finding that is 'plausible' in light of the full record-even if another is equally or more so-must govern." Cooper , 581 U. S., at ----, 137 S.Ct., at 1465.
Without actually disputing any of the evidence we have discussed, Justice ALITO maintains that the plaintiffs could have introduced still more evidence to support the District Court's determination. See post , at 2163. As we have said, however, "the trial on the merits should be 'the "main event" ... rather than a "tryout on the road." ' " Anderson , 470 U.S. at 575, 105 S.Ct. 1504. "[T]he parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level"-let alone another nine in this Court-"is requiring too much." Ibid.
Other Doctors
Finally, Justice ALITO and Justice GORSUCH suggest that the District Court failed to account for the possibility that new abortion providers might eventually replace Does 1, 2, 3, 5, and 6. See post, at 2158 - 2159 (opinion of ALITO, J.); post, at 2176 - 2177 (opinion of GORSUCH, J.). But the Court of Appeals did not dispute, and the record supports, the District Court's additional finding that, for "the same reasons that Does 1, 2, 4, 5, and 6 have had difficulties getting active admitting privileges, reasons unrelated to their competence ... it is unlikely that the [a]ffected clinics will be able to comply with the Act by recruiting new physicians who have or can obtain admitting privileges." 250 F.Supp.3d at 82.
B
Act 620's Impact on Abortion Access
The District Court drew from the record evidence, including the factual findings we have just discussed, several conclusions in respect to the burden that Act 620 is likely to impose upon women's ability to access abortions in Louisiana. To better understand the significance of these conclusions, the reader should keep in mind the geographic distribution of the doctors and their clinics. Figure 1 shows the distribution of doctors and clinics at the time of the District Court's decision. Figure 2 shows the projected distribution if the admitting-privileges requirement were enforced, as found by the District Court. The figures in parentheses indicate the approximate number of abortions each physician performed annually, according to the District Court.
Figure 1 - Distribution of Abortion Clinics and Providers at the Time of the District Court's Decision *2129 Figure 2 - Projected Distribution of Abortion Clinics and Providers Following Enforcement of Act 620
1
As we have seen, enforcing the admitting-privileges requirement would eliminate Does 1, 2, and 6. The District Court credited Doe 3's uncontradicted, in-court testimony that he would stop performing abortions if he was the last provider in northern Louisiana. 250 F.Supp.3d at 79 ; see App. 263-265. So the departure of Does 1 and 2 would also eliminate Doe 3. That would leave only Doe 5. And Doe 5's inability to obtain privileges in the Baton Rouge area would leave Louisiana with just one clinic with one provider to serve the 10,000 women annually who seek abortions in the State. 250 F.Supp.3d at 80, 87-88 ; cf. Whole Woman's Health , 579 U. S., at ----, 136 S.Ct. (slip op., at 26).
Working full time in New Orleans, Doe 5 would be able to absorb no more than about 30% of the annual demand for abortions in Louisiana. App. 1134, 1331; see id., at 1129. And because Doe 5 does not perform abortions beyond 18 weeks, women between 18 weeks and the state legal limit of 20 weeks would have little or no way to exercise their constitutional right to an abortion. Id., at 1330-1331.
Those women not altogether prevented from obtaining an abortion would face other burdens. As in Whole Woman's Health , the reduction in abortion providers caused *2130 by Act 620 would inevitably mean "longer waiting times, and increased crowding." 579 U. S., at ----, 136 S.Ct. (slip op., at 26). The District Court heard testimony that delays in obtaining an abortion increase the risk that a woman will experience complications from the procedure and may make it impossible for her to choose a noninvasive medication abortion. App. 220, 290, 312-313; see also id., at 1139, 1305, 1313, 1316, 1323.
Even if they obtain an appointment at a clinic, women who might previously have gone to a clinic in Baton Rouge or Shreveport would face increased driving distances. New Orleans is nearly a five hour drive from Shreveport; it is over an hour from Baton Rouge; and Baton Rouge is more than four hours from Shreveport. The impact of those increases would be magnified by Louisiana's requirement that every woman undergo an ultrasound and receive mandatory counseling at least 24 hours before an abortion. La. Rev. Stat. Ann. § 40:1061.10(D). A Shreveport resident seeking an abortion who might previously have obtained care at one of that city's local clinics would either have to spend nearly 20 hours driving back and forth to Doe 5's clinic twice, or else find overnight lodging in New Orleans. As the District Court stated, both experts and laypersons testified that the burdens of this increased travel would fall disproportionately on poor women, who are least able to absorb them. App. 106-107, 178, 502-508, 543; see also id., at 311-312.
2
We note that the Court of Appeals also faulted the District Court for factoring Doe 3's departure into its calculations. The appeals court thought that Doe 3's personal choice to stop practicing could not be attributed to Act 620. 905 F.3d at 810-811. That is beside the point. Even if we pretended as though (contrary to the record evidence) Doe 3 would continue to provide abortions at Shreveport-based Hope Clinic, the record nonetheless supports the District Court's alternative finding that Act 620's burdens would remain substantial. See 250 F.Supp.3d at 80-81, 84, 87.
The record tells us that Doe 3 is presently able to see roughly 1,000-1,500 women annually. Id., at 81 ; see App. 207, 243-244. Doe 3 testified that this was in addition to "working very, very long hours maintaining [his] private [OB/GYN] practice." Id., at 265, 1323; see id., at 118, 1147. And, the District Court found that Doe 5 can perform no more than roughly 3,000 abortions annually. See supra, at 2129. So even if Doe 3 remained active in Shreveport, the annual demand for abortions in Louisiana would be more than double the capacity. And although the availability of abortions in Shreveport might lessen the driving distances faced by some women, it would still leave thousands of Louisiana women with no practical means of obtaining a safe, legal abortion, and it would not meaningfully address the health risks associated with crowding and delay for those able to secure an appointment with one of the State's two remaining providers.
* * *
Taken together, we think that these findings and the evidence that underlies them are sufficient to support the District Court's conclusion that Act 620 would place substantial obstacles in the path of women seeking an abortion in Louisiana.
V
Benefits
We turn finally to the law's asserted benefits. The District Court found that there was " 'no significant health-related problem that the new law helped to cure.' " 250 F.Supp.3d at 86 (quoting *2131 Whole Woman's Health , 579 U. S., at ----, 136 S.Ct. (slip op., at 22) ). It found that the admitting-privileges requirement "[d]oes [n]ot [p]rotect [w]omen's [h]ealth," provides "no significant health benefits," and makes no improvement to women's health "compared to prior law." 250 F.Supp.3d at 86 (boldface deleted). Our examination of the record convinces us that these findings are not "clearly erroneous."
First, the District Court found that the admitting-privileges requirement serves no "relevant credentialing function." Id., at 87 (quoting Whole Woman's Health , 579 U. S., at ----, 136 S.Ct. (slip op., at 25) ). As we have seen, hospitals can, and do, deny admitting privileges for reasons unrelated to a doctor's ability safely to perform abortions. And Act 620's requirement that physicians obtain privileges at a hospital within 30 miles of the place where they perform abortions further constrains providers for reasons that bear no relationship to competence.
Moreover, while "competency is a factor" in credentialing decisions, 250 F.Supp.3d at 46, hospitals primarily focus upon a doctor's ability to perform the inpatient, hospital-based procedures for which the doctor seeks privileges-not outpatient abortions. App. 877, 1373; see id., at 907; Brief for Medical Staff Professionals as Amici Curiae 26; Brief for American College of Obstetricians and Gynecologists et al. as Amici Curiae 12. Indeed, the State's admitting-privileges expert, Dr. Robert Marier, testified that, when he served as the Executive Director of Louisiana's Board of Medical Examiners, he concurred in the Board's position that a physician was competent to perform first-trimester surgical abortions and to "recognize and address complications from the procedure" so long as they had completed an accredited residency in obstetrics and gynecology or been trained in abortion procedures during another residency-irrespective of their affiliation with any hospital. App. 872-873, 1305; cf. post, at 2155 - 2156 (ALITO, J., dissenting). And nothing in the record indicates that the background vetting for admitting privileges adds significantly to the vetting that the State Board of Medical Examiners already provides. 250 F.Supp.3d at 87 ; App. 1355-1356, 1358-1359.
Second, the District Court found that the admitting-privileges requirement "does not conform to prevailing medical standards and will not improve the safety of abortion in Louisiana." 250 F.Supp.3d at 64 ; see id., at 64-66. As in Whole Woman's Health , the expert and lay testimony presented at trial shows that:
• "Complications from surgical abortion are relatively rare," and "[t]hey very rarely require transfer to a hospital or emergency room and are generally not serious." App. 287; see id ., at 129; cf. Whole Woman's Health , 579 U. S., at ----, 136 S.Ct. (slip op., at 22-23).
• For those patients who do experience complications at the clinic, the transfer agreement required by existing law is "sufficient to ensure continuity of care for patients in an emergency." App. 1050; see id ., at 194, 330-332, 1059.
• The "standard protocol" when a patient experiences a complication after returning home from the clinic is to send her "to the hospital that is nearest and able to provide the service that the patient needs," which is not necessarily a hospital within 30 miles of the clinic. Id ., at 351; see id ., at 115-116, 180, 793; La. Rev. Stat. Ann. § 40:1061.10(A)(2)(b)(ii) (requiring abortion providers to furnish patients with the name and telephone number of the hospital nearest to *2132 their home); cf. Whole Woman's Health , 579 U. S., at ----, 136 S.Ct. (slip op., at 23).
As in Whole Woman's Health , the State introduced no evidence "showing that patients have better outcomes when their physicians have admitting privileges" or "of any instance in which an admitting privileges requirement would have helped even one woman obtain better treatment." 250 F.Supp.3d at 64 ; Whole Woman's Health , 579 U. S., at ---- - ----, 136 S.Ct. (slip op., at 23-24) ; see also Centers for Medicare and Medicaid Services, 84 Fed. Reg. 51790-51791 (2019) ("Under modern procedures, emergency responders (and patients themselves) take patients to hospital emergency rooms without regard to prior agreements between particular physicians and particular hospitals"); Brief for American College of Obstetricians and Gynecologists et al. as Amici Curiae 6 (local admitting-privileges requirements for abortion providers offer no medical benefit and do not meaningfully advance continuity of care).
VI
Conclusion
We conclude, in light of the record, that the District Court's significant factual findings-both as to burdens and as to benefits-have ample evidentiary support. None is "clearly erroneous." Given the facts found, we must also uphold the District Court's related factual and legal determinations. These include its determination that Louisiana's law poses a "substantial obstacle" to women seeking an abortion; its determination that the law offers no significant health-related benefits; and its determination that the law consequently imposes an "undue burden" on a woman's constitutional right to choose to have an abortion. We also agree with its ultimate legal conclusion that, in light of these findings and our precedents, Act 620 violates the Constitution.
VII
As a postscript, we explain why we have found unconvincing several further arguments that the State has made. First, the State suggests that the record supports the Court of Appeals' conclusion that Act 620 poses no substantial obstacle to the abortion decision. See Brief for Respondent 73, 80. This argument misconceives the question before us. "The question we must answer" is "not whether the [Fifth] Circuit's interpretation of the facts was clearly erroneous, but whether the District Court's finding[s were] clearly erroneous." Anderson , 470 U.S. at 577, 105 S.Ct. 1504 (emphasis added). As we have explained, we think the District Court's factual findings here are plausible in light of the record as a whole. Nothing in the State's briefing furnishes a basis to disturb that conclusion.
Second, the State says that the record does not show that Act 620 will burden every woman in Louisiana who seeks an abortion. Brief for Respondent 69-70 (citing United States v. Salerno , 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ). True, but beside the point. As we stated in Casey , a State's abortion-related law is unconstitutional on its face if "it will operate as a substantial obstacle to a woman's choice to undergo an abortion" in "a large fraction of the cases in which [it] is relevant." 505 U.S. at 895, 112 S.Ct. 2791 (majority opinion). In Whole Woman's Health , we reaffirmed that standard. We made clear that the phrase refers to a large fraction of "those women for whom the provision is an actual rather than an irrelevant restriction." 579 U. S., at ---- (slip op., at 39) (quoting Casey , 505 U.S. at 895, 112 S.Ct. 2791 ; brackets omitted).
*2133 That standard, not an "every woman" standard, is the standard that must govern in this case.
Third, the State argues that Act 620 would not make it "nearly impossible" for a woman to obtain an abortion. Brief for Respondent 71-72. But, again, the words "nearly impossible" do not describe the legal standard that governs here. Since Casey , we have repeatedly reiterated that the plaintiff's burden in a challenge to an abortion regulation is to show that the regulation's "purpose or effect" is to "plac[e] a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U.S. at 877, 112 S.Ct. 2791 (plurality opinion); see Whole Woman's Health , 579 U. S., at ----, 136 S.Ct. (slip op., at 8) ; Gonzales , 550 U.S. at 156, 127 S.Ct. 1610 ; Stenberg , 530 U.S. at 921, 120 S.Ct. 2597 ; Mazurek , 520 U.S. at 971, 117 S.Ct. 1865.
Finally, the State makes several arguments about the standard of review that it would have us apply in cases where a regulation is found not to impose a substantial obstacle to a woman's choice. Brief for Respondent 60-66. That, however, is not this case. The record here establishes that Act 620's admitting-privileges requirement places a substantial obstacle in the path of a large fraction of those women seeking an abortion for whom it is a relevant restriction.
* * *
This case is similar to, nearly identical with, Whole Woman's Health. And the law must consequently reach a similar conclusion. Act 620 is unconstitutional. The Court of Appeals' judgment is erroneous. It is
Reversed .
CHIEF JUSTICE ROBERTS, concurring in the judgment.
In July 2013, Texas enacted a law requiring a physician performing an abortion to have "active admitting privileges at a hospital ... located not further than 30 miles from the location at which the abortion is performed." Tex. Health & Safety Code Ann. § 171.0031(a)(1)(A) (West Cum. Supp. 2019). The law caused the number of facilities providing abortions to drop in half. In Whole Woman's Health v. Hellerstedt , 579 U. S. ----, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016), the Court concluded that Texas's admitting privileges requirement "places a substantial obstacle in the path of women seeking a previability abortion" and therefore violated the Due Process Clause of the Fourteenth Amendment. Id., at ----, 136 S.Ct. (slip op., at 2) (citing Planned Parenthood of Southeastern Pa. v. Casey , 505 U.S. 833, 878, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion)).
I joined the dissent in Whole Woman's Health and continue to believe that the case was wrongly decided. The question today however is not whether Whole Woman's Health was right or wrong, but whether to adhere to it in deciding the present case. See Moore v. Texas , 586 U. S. ----, ----, 139 S.Ct. 666, 203 L.Ed.2d 1 (2019) (ROBERTS, C. J., concurring) (slip op., at 1).
Today's case is a challenge from several abortion clinics and providers to a Louisiana law nearly identical to the Texas law struck down four years ago in Whole Woman's Health . Just like the Texas law, the Louisiana law requires physicians performing abortions to have "active admitting privileges at a hospital ... located not further than thirty miles from the location at which the abortion is performed." La. Rev. Stat. Ann. § 40:1061.10(A)(2)(a) (West Cum. Supp. 2020). Following a six-day bench trial, the District Court found that Louisiana's law would "result in a drastic reduction in the number and geographic *2134 distribution of abortion providers." June Medical Services LLC v. Kliebert , 250 F.Supp.3d 27, 87 (MD La. 2017). The law would reduce the number of clinics from three to "one, or at most two," and the number of physicians providing abortions from five to "one, or at most two," and "therefore cripple women's ability to have an abortion in Louisiana." Id., at 87-88.
The legal doctrine of stare decisis requires us, absent special circumstances, to treat like cases alike. The Louisiana law imposes a burden on access to abortion just as severe as that imposed by the Texas law, for the same reasons. Therefore Louisiana's law cannot stand under our precedents.
I
Stare decisis ("to stand by things decided") is the legal term for fidelity to precedent. Black's Law Dictionary 1696 (11th ed. 2019). It has long been "an established rule to abide by former precedents, where the same points come again in litigation; as well to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion." 1 W. Blackstone, Commentaries on the Laws of England 69 (1765). This principle is grounded in a basic humility that recognizes today's legal issues are often not so different from the questions of yesterday and that we are not the first ones to try to answer them. Because the "private stock of reason ... in each man is small, ... individuals would do better to avail themselves of the general bank and capital of nations and of ages." 3 E. Burke, Reflections on the Revolution in France 110 (1790).
Adherence to precedent is necessary to "avoid an arbitrary discretion in the courts." The Federalist No. 78, p. 529 (J. Cooke ed. 1961) (A. Hamilton). The constraint of precedent distinguishes the judicial "method and philosophy from those of the political and legislative process." Jackson, Decisional Law and Stare Decisis, 30 A. B. A. J. 334 (1944).
The doctrine also brings pragmatic benefits. Respect for precedent "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee , 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). It is the "means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." Vasquez v. Hillery , 474 U.S. 254, 265, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). In that way, "stare decisis is an old friend of the common lawyer." Jackson , supra, at 334, 73 S.Ct. 1031.
Stare decisis is not an "inexorable command." Ramos v. Louisiana , 590 U. S. ----, ----, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020) (slip op., at 20) (internal quotation marks omitted). But for precedent to mean anything, the doctrine must give way only to a rationale that goes beyond whether the case was decided correctly. The Court accordingly considers additional factors before overruling a precedent, such as its administrability, its fit with subsequent factual and legal developments, and the reliance interests that the precedent has engendered. See Janus v. State, County, and Municipal Employees, 585 U. S. ----, ---- - ----, 138 S.Ct. 2448, 201 L.Ed.2d 924 (2018) (slip op., at 34-35).
Stare decisis principles also determine how we handle a decision that itself departed from the cases that came before it. In those instances, "[r]emaining true to an 'intrinsically sounder' doctrine established in prior cases better serves the values of stare decisis than would following" the recent departure.
*2135 Adarand Constructors, Inc. v. Peña , 515 U.S. 200, 231, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (plurality opinion). Stare decisis is pragmatic and contextual, not "a mechanical formula of adherence to the latest decision." Helvering v. Hallock , 309 U.S. 106, 119, 60 S.Ct. 444, 84 L.Ed. 604 (1940).
II
A
Both Louisiana and the providers agree that the undue burden standard announced in Casey provides the appropriate framework to analyze Louisiana's law. Brief for Petitioners in No. 18-1323, pp. 45-47; Brief for Respondent in No. 18-1323, pp. 60-62. Neither party has asked us to reassess the constitutional validity of that standard.
Casey reaffirmed "the most central principle of Roe v. Wade ," "a woman's right to terminate her pregnancy before viability." Casey , 505 U.S. at 871, 112 S.Ct. 2791 (plurality opinion).[1] At the same time, it recognized that the State has "important and legitimate interests in ... protecting the health of the pregnant woman and in protecting the potentiality of human life." Id., at 875-876, 112 S.Ct. 2791 (internal quotation marks and brackets omitted).
To serve the former interest, the State may, "[a]s with any medical procedure," enact "regulations to further the health or safety of a woman seeking an abortion." Id., at 878, 112 S.Ct. 2791. To serve the latter interest, the State may, among other things, "enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term." Id., at 872, 112 S.Ct. 2791. The State's freedom to enact such rules is "consistent with Roe 's central premises, and indeed the inevitable consequence of our holding that the State has an interest in protecting the life of the unborn." Id., at 873, 112 S.Ct. 2791.
Under Casey , the State may not impose an undue burden on the woman's ability to obtain an abortion. "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Id., at 877, 112 S.Ct. 2791. Laws that do not pose a substantial obstacle to abortion access are permissible, so long as they are "reasonably related" to a legitimate state interest. Id., at 878, 112 S.Ct. 2791.
After faithfully reciting this standard, the Court in Whole Woman's Health added the following observation: "The rule announced in Casey ... requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." 579 U. S., at ---- - ----, 136 S.Ct. (slip op., at 19-20). The plurality repeats today that the undue burden standard requires courts "to weigh the law's asserted benefits against the burdens it imposes on abortion access." Ante, at 2112 (internal quotation marks omitted).
Read in isolation from Casey , such an inquiry could invite a grand "balancing test in which unweighted factors mysteriously are weighed." Marrs v. Motorola, Inc. , 577 F.3d 783, 788 (CA7 2009). Under such tests, "equality of treatment is ... impossible to achieve; predictability is destroyed; judicial arbitrariness is facilitated; judicial courage is impaired." Scalia, *2136 The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1182 (1989).
In this context, courts applying a balancing test would be asked in essence to weigh the State's interests in "protecting the potentiality of human life" and the health of the woman, on the one hand, against the woman's liberty interest in defining her "own concept of existence, of meaning, of the universe, and of the mystery of human life" on the other. Casey , 505 U.S. at 851, 112 S.Ct. 2791 (opinion of the Court); id., at 871, 112 S.Ct. 2791 (plurality opinion) (internal quotation marks omitted). There is no plausible sense in which anyone, let alone this Court, could objectively assign weight to such imponderable values and no meaningful way to compare them if there were. Attempting to do so would be like "judging whether a particular line is longer than a particular rock is heavy," Bendix Autolite Corp. v. Midwesco Enterprises, Inc. , 486 U.S. 888, 897, 108 S.Ct. 2218, 100 L.Ed.2d 896 (1988) (Scalia, J., concurring in judgment). Pretending that we could pull that off would require us to act as legislators, not judges, and would result in nothing other than an "unanalyzed exercise of judicial will" in the guise of a "neutral utilitarian calculus." New Jersey v. T. L. O. , 469 U.S. 325, 369, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Brennan, J., concurring in part and dissenting in part).
Nothing about Casey suggested that a weighing of costs and benefits of an abortion regulation was a job for the courts. On the contrary, we have explained that the "traditional rule" that "state and federal legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty" is "consistent with Casey ." Gonzales v. Carhart , 550 U.S. 124, 163, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). Casey instead focuses on the existence of a substantial obstacle, the sort of inquiry familiar to judges across a variety of contexts. See, e.g., Burwell v. Hobby Lobby Stores, Inc. , 573 U.S. 682, 694-695, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014) (asking whether the government "substantially burdens a person's exercise of religion" under the Religious Freedom Restoration Act); Arizona Free Enterprise Club's Freedom Club PAC v. Bennett , 564 U.S. 721, 748, 131 S.Ct. 2806, 180 L.Ed.2d 664 (2011) (asking whether a law "imposes a substantial burden on the speech of privately financed candidates and independent expenditure groups"); Murphy v. United Parcel Service, Inc. , 527 U.S. 516, 521, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (asking, in the context of the Americans with Disabilities Act, whether an individual's impairment "substantially limits one or more major life activities" (internal quotation marks omitted)).
Casey 's analysis of the various restrictions that were at issue in that case is illustrative. For example, the opinion recognized that Pennsylvania's 24-hour waiting period for abortions "has the effect of increasing the cost and risk of delay of abortions," but observed that the District Court did not find that the "increased costs and potential delays amount to substantial obstacles." 505 U.S. at 886, 112 S.Ct. 2791 (joint opinion of O'Connor, Kennedy, and Souter, JJ.) (internal quotation marks omitted). The opinion concluded that "given the statute's definition of medical emergency," the waiting period did not "impose[ ] a real health risk." Ibid. Because the law did not impose a substantial obstacle, Casey upheld it. And it did so notwithstanding the District Court's finding that the law did "not further the state interest in maternal health." Ibid. (internal quotation marks omitted).
Turning to the State's various recordkeeping and reporting requirements, Casey found those requirements do not "impose *2137 a substantial obstacle to a woman's choice" because "[a]t most they increase the cost of some abortions by a slight amount." Id., at 901, 112 S.Ct. 2791. "While at some point increased cost could become a substantial obstacle," there was "no such showing on the record" before the Court. Ibid. The Court did not weigh this cost against the benefits of the law.
The same was true for Pennsylvania's parental consent requirement. Casey held that "a State may require a minor seeking an abortion to obtain the consent of a parent or guardian, provided there is an adequate judicial bypass procedure." Id., at 899, 112 S.Ct. 2791 (citing, among other cases, Ohio v. Akron Center for Reproductive Health , 497 U.S. 502, 510-519, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) ). Casey relied on precedent establishing that judicial bypass procedures "prevent another person from having an absolute veto power over a minor's decision to have an abortion." Akron , 497 U.S. at 510, 110 S.Ct. 2972. Without a judicial bypass, parental consent laws impose a substantial obstacle to a minor's ability to obtain an abortion and therefore constitute an undue burden. See Casey , 505 U.S. at 899, 112 S.Ct. 2791 (joint opinion).
The opinion similarly looked to whether there was a substantial burden, not whether benefits outweighed burdens, in analyzing Pennsylvania's requirement that physicians provide certain "truthful, nonmisleading information" about the nature of the abortion procedure. Id. , at 882, 112 S.Ct. 2791. The opinion concluded that the requirement "cannot be considered a substantial obstacle to obtaining an abortion, and, it follows , there is no undue burden." Id. , at 883, 112 S.Ct. 2791 (emphasis added).
With regard to the State's requirement that a physician, as opposed to a qualified assistant, provide the woman this information, the opinion reasoned: "Since there is no evidence on this record that requiring a doctor to give the information as provided by the statute would amount in practical terms to a substantial obstacle to a woman seeking an abortion, we conclude that it is not an undue burden." Id., at 884-885, 112 S.Ct. 2791 (emphasis added). This was so "even if an objective assessment might suggest that those same tasks could be performed by others," meaning the law had little if any benefit. Id., at 885, 112 S.Ct. 2791.
The only restriction Casey found unconstitutional was Pennsylvania's spousal notification requirement. On that score, the Court recited a bevy of social science evidence demonstrating that "millions of women in this country ... may have justifiable fears of physical abuse" or "devastating forms of psychological abuse from their husbands." Id., at 893, 112 S.Ct. 2791 (opinion of the Court). In addition to "physical violence" and "child abuse," women justifiably feared "verbal harassment, threats of future violence, the destruction of possessions, physical confinement to the home, the withdrawal of financial support, or the disclosure of the abortion to family and friends." Ibid. The spousal notification requirement was "thus likely to prevent a significant number of women from obtaining an abortion." Ibid. It did not "merely make abortions a little more difficult or expensive to obtain; for many women, it [imposed] a substantial obstacle." Id., at 893-894, 112 S.Ct. 2791. The Court emphasized that it would not "blind [itself] to the fact that the significant number of women who fear for their safety and the safety of their children are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion in all cases." Id., at 894, 112 S.Ct. 2791.
*2138 The upshot of Casey is clear: The several restrictions that did not impose a substantial obstacle were constitutional, while the restriction that did impose a substantial obstacle was unconstitutional.
To be sure, the Court at times discussed the benefits of the regulations, including when it distinguished spousal notification from parental consent. See Whole Woman's Health , 579 U. S., at ---- - ----, 136 S.Ct. (slip op., at 19-20) (citing Casey , 505 U.S. at 887-898, 112 S.Ct. 2791 (opinion of the Court); id., at 899-901, 112 S.Ct. 2791 (joint opinion). But in the context of Casey 's governing standard, these benefits were not placed on a scale opposite the law's burdens. Rather, Casey discussed benefits in considering the threshold requirement that the State have a "legitimate purpose" and that the law be "reasonably related to that goal." Id. , at 878, 112 S.Ct. 2791 (plurality opinion); id., at 882, 112 S.Ct. 2791 (joint opinion).
So long as that showing is made, the only question for a court is whether a law has the "effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Id. , at 877, 112 S.Ct. 2791 (plurality opinion). Casey repeats that "substantial obstacle" standard nearly verbatim no less than 15 times. Id., at 846, 894, 895, 112 S.Ct. 2791 (opinion of the Court); id., at 877, 878, 112 S.Ct. 2791 (plurality opinion); id., at 883, 884, 885, 886, 887, 901, 112 S.Ct. 2791 (joint opinion).[2]
The only place a balancing test appears in Casey is in Justice Stevens's partial dissent. "Weighing the State's interest in potential life and the woman's liberty interest," Justice Stevens would have gone further than the plurality to strike down portions of the State's informed consent requirements and 24-hour waiting period. Id., at 916-920, 112 S.Ct. 2791 (opinion concurring in part and dissenting in part). But that approach did not win the day.
Mazurek v. Armstrong places this understanding of Casey 's undue burden standard beyond doubt. Mazurek involved a challenge to a Montana law restricting the performance of abortions to licensed physicians. 520 U.S. at 969, 117 S.Ct. 1865. It was "uncontested that there was insufficient evidence of a 'substantial obstacle' to abortion." Id., at 972, 117 S.Ct. 1865. Therefore, once the Court found that the Montana Legislature had not acted with an "unlawful motive," the Court's work was complete. Ibid . In fact, the Court found the challengers' argument-that the law was invalid because "all health evidence contradicts the [State's] claim that there is any health basis for the law"-to be "squarely foreclosed by Casey itself." Id., at 973, 117 S.Ct. 1865 (internal quotation marks omitted; emphasis added).
We should respect the statement in Whole Woman's Health that it was applying the undue burden standard of Casey . The opinion in Whole Woman's Health began by saying, "We must here decide *2139 whether two provisions of [the Texas law] violate the Federal Constitution as interpreted in Casey . " 579 U. S., at ----, 136 S.Ct. (slip op., at 1). Nothing more. The Court explicitly stated that it was applying "the standard, as described in Casey ," and reversed the Court of Appeals for applying an approach that did "not match the standard that this Court laid out in Casey ." Id., at ----, ----, 136 S.Ct. (slip op., at 19, 20).
Here the plurality expressly acknowledges that we are not considering how to analyze an abortion regulation that does not present a substantial obstacle. "That," the plurality explains, "is not this case." Ante , at 2133. In this case, Casey 's requirement of finding a substantial obstacle before invalidating an abortion regulation is therefore a sufficient basis for the decision, as it was in Whole Woman's Health . In neither case, nor in Casey itself, was there call for consideration of a regulation's benefits, and nothing in Casey commands such consideration. Under principles of stare decisis , I agree with the plurality that the determination in Whole Woman's Health that Texas's law imposed a substantial obstacle requires the same determination about Louisiana's law. Under those same principles, I would adhere to the holding of Casey , requiring a substantial obstacle before striking down an abortion regulation.
B
Whole Woman's Health held that Texas's admitting privileges requirement placed "a substantial obstacle in the path of women seeking a previability abortion," independent of its discussion of benefits. 579 U. S., at ----, 136 S.Ct. (slip op., at 2) (citing Casey , 505 U.S. at 878, 112 S.Ct. 2791 (plurality opinion)).[3] Because Louisiana's admitting privileges requirement would restrict women's access to abortion to the same degree as Texas's law, it also cannot stand under our precedent.[4]
To begin, the two laws are nearly identical. Prior to enactment of the Texas law, abortion providers were required either to possess local hospital admitting privileges or to have a transfer agreement with a physician who had such privileges. Tex. Admin. Code, tit. 25, § 139.56(a) (2009). The new law, adopted in 2013, eliminated the option of having a transfer agreement. Providers were required to "[h]ave active admitting privileges at a hospital ... located not further than 30 miles from the location at which the abortion is performed." Tex. Health & Safety Code Ann. § 171.0031(a)(1)(A).
Likewise, Louisiana law previously required abortion providers to have either admitting privileges or a transfer agreement.
*2140 La. Admin. Code, tit. 48, pt. I, § 4407(A)(3) (2003), 29 La. Reg. 706-707 (2003). In 2014, Louisiana removed the option of having a transfer agreement. Just like Texas, Louisiana now requires abortion providers to "[h]ave active admitting privileges at a hospital ... located not further than thirty miles from the location at which the abortion is performed." La. Rev. Stat. § 40:1061.10(A)(2)(a).
Crucially, the District Court findings indicate that Louisiana's law would restrict access to abortion in just the same way as Texas's law, to the same degree or worse. In Texas, "as of the time the admitting-privileges requirement began to be enforced, the number of facilities providing abortions dropped in half, from about 40 to about 20." Whole Woman's Health , 579 U. S., at ----, 136 S.Ct. (slip op., at 24). Eight abortion clinics closed in the months prior to the law's effective date. Ibid. Another 11 clinics closed on the day the law took effect. Ibid.
Similarly, the District Court found that the Louisiana law would "result in a drastic reduction in the number and geographic distribution of abortion providers." 250 F.Supp.3d at 87. At the time of the District Court's decision, there were three clinics and five physicians performing abortions in Louisiana. Id., at 40, 41. The District Court found that the new law would reduce "the number of clinics to one, or at most two," and the number of physicians in Louisiana to "one, or at most two," as well. Id., at 87. Even in the best case, "the demand for services would vastly exceed the supply." Ibid.
Whole Woman's Health found that the closures of the abortion clinics led to "fewer doctors, longer waiting times, and increased crowding." 579 U. S., at ----, 136 S.Ct. (slip op., at 26). The Court also found that "the number of women of reproductive age living in a county more than 150 miles from a provider increased from approximately 86,000 to 400,000 and the number of women living in a county more than 200 miles from a provider from approximately 10,000 to 290,000." Ibid. (internal quotation marks and alterations omitted).
The District Court here likewise found that the Louisiana law would result in "longer waiting times for appointments, increased crowding and increased associated health risk." 250 F.Supp.3d at 81. The court found that Louisiana women already "have difficulty affording or arranging for transportation and childcare on the days of their clinic visits" and that "[i]ncreased travel distance" would exacerbate this difficulty. Id., at 83. The law would prove "particularly burdensome for women living in northern Louisiana ... who once could access a clinic in their own area [and] will now have to travel approximately 320 miles to New Orleans." Ibid.
In Texas, "common prerequisites to obtaining admitting privileges that [had] nothing to do with ability to perform medical procedures," including "clinical data requirements, residency requirements, and other discretionary factors," made it difficult for well-credentialed abortion physicians to obtain such privileges. Whole Woman's Health , 579 U. S., at ----, 136 S.Ct. (slip op., at 25). In particular, the Court found that "hospitals often condition[ed] admitting privileges on reaching a certain number of admissions per year." Id., at ----, 136 S.Ct. (slip op., at 24) (internal quotation marks omitted). But because complications requiring hospitalization are relatively rare, abortion providers were "unlikely to have any patients to admit" and thus were "unable to maintain admitting privileges or obtain those privileges for the future." Id., at ----, 136 S.Ct. (slip op., at 25).
So too here. "While a physician's competency is a factor in assessing an applicant *2141 for admitting privileges" in Louisiana, "it is only one factor that hospitals consider in whether to grant privileges." 250 F.Supp.3d at 46. Louisiana hospitals "may deny privileges or decline to consider an application for privileges for myriad reasons unrelated to competency," including "the physician's expected usage of the hospital and intent to admit and treat patients there, the number of patients the physician has treated in the hospital in the recent past, the needs of the hospital, the mission of the hospital, or the business model of the hospital." Ibid.[5]
And the District Court found that, as in Texas, Louisiana "hospitals often grant admitting privileges to a physician because the physician plans to provide services in the hospital" and that "[i]n general, hospital admitting privileges are not provided to physicians who never intend to provide services in a hospital." Id., at ----, 136 S.Ct., at ----. But "[b]ecause, by all accounts, abortion complications are rare, an abortion provider is unlikely to have a consistent need to admit patients." Id., at ----, 136 S.Ct., at (citations omitted).[6]
Importantly, the District Court found that "since the passage of [the Louisiana law], all five remaining doctors have attempted in good faith to comply" with the law by applying for admitting privileges, yet have had very little success. Id. , at 78 (emphasis added). This finding was necessary to ensure that the physicians' inability to obtain admitting privileges was attributable to the new law rather than a halfhearted attempt to obtain privileges. Only then could the District Court accurately identify the Louisiana law's burden on abortion access.
The question is not whether we would reach the same findings from the same record. These District Court findings "entail[ed] primarily ... factual work" and therefore are "review[ed] only for clear error." U. S. Bank N. A. v. Village at Lakeridge , LLC , 583 U. S. ----, ----, ----, 138 S.Ct. 960, 200 L.Ed.2d 218 (2018) (slip op., at 6, 9). Clear error review follows from a candid appraisal of the comparative advantages of trial courts and appellate courts. "While we review transcripts for a living, they listen to witnesses for a living. While we largely read briefs for a living, they largely assess the credibility of parties and witnesses for a living." Taglieri v. Monasky , 907 F.3d 404, 408 (CA6 2018) (en banc).
We accordingly will not disturb the factual conclusions of the trial court unless we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co. , 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). In my view, the District Court's work reveals no such clear error, for the reasons the plurality explains. Ante, at 2138 - 2142. The District Court findings therefore bind us in this case.
* * *
Stare decisis instructs us to treat like cases alike. The result in this case is controlled *2142 by our decision four years ago invalidating a nearly identical Texas law. The Louisiana law burdens women seeking previability abortions to the same extent as the Texas law, according to factual findings that are not clearly erroneous. For that reason, I concur in the judgment of the Court that the Louisiana law is unconstitutional.

Although parts of Casey 's joint opinion were a plurality not joined by a majority of the Court, the joint opinion is nonetheless considered the holding of the Court under Marks v. United States , 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), as the narrowest position supporting the judgment.

Justice GORSUCH correctly notes that Casey "expressly disavowed any test as strict as strict scrutiny." Post, at 2181 (dissenting opinion). But he certainly is wrong to suggest that my position is in any way inconsistent with that disavowal. Applying strict scrutiny would require "any regulation touching upon the abortion decision" to be the least restrictive means to further a compelling state interest. Casey , 505 U.S. at 871, 112 S.Ct. 2791 (plurality opinion) (emphasis added). Casey however recognized that such a test would give "too little acknowledgement and implementation" to the State's "legitimate interests in the health of the woman and in protecting the potential life within her." Ibid. Under Casey , abortion regulations are valid so long as they do not pose a substantial obstacle and meet the threshold requirement of being "reasonably related" to a "legitimate purpose." Id. , at 878, 112 S.Ct. 2791 ; id. , at 882, 112 S.Ct. 2791 (joint opinion).

Justice GORSUCH considers this is a "nonexistent ruling" nowhere to be found in Whole Woman's Health . Post , at 2181 (dissenting opinion). I disagree. Whole Woman's Health first surveyed the benefits of Texas's admitting privileges requirement. 579 U. S., at ---- - ----, 136 S.Ct. (slip op., at 23-24). The Court then transitioned to examining the law's burdens: "At the same time , the record evidence indicates that the admitting-privileges requirement places a substantial obstacle in the path of a woman's choice." Id. , at ----, 136 S.Ct. (slip op., at 24) (internal quotation marks omitted; emphasis added). And the Court made clear that a law which has the purpose or effect of placing "a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability" imposes an "undue burden" and therefore violates the Constitution. Id. , at ----, 136 S.Ct. (slip op., at 1) (internal quotation marks omitted; emphasis deleted). Thus the discussion of benefits in Whole Woman's Health was not necessary to its holding.

For the reasons the plurality explains, ante, at 2117 - 2120, I agree that the abortion providers in this case have standing to assert the constitutional rights of their patients.

Justice ALITO misunderstands my discussion of credentials as focusing on the law's lack of benefits. See post , at 2154 - 2155 (dissenting opinion). But my analysis, like Casey , is limited to the law's effect on the availability of abortion.

I agree with Justice ALITO that the validity of admitting privileges laws "depend[s] on numerous factors that may differ from State to State." Post , at 2157 (dissenting opinion). And I agree with Justice GORSUCH that "[w]hen it comes to the factual record, litigants normally start the case on a clean slate." Post, at 2178 (dissenting opinion). Appreciating that others may in good faith disagree, however, I cannot view the record here as in any pertinent respect sufficiently different from that in Whole Woman's Health to warrant a different outcome.