# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 13, 2020

Lyle W. Cayce
Clerk

No. 17-51060

WHOLE WOMAN'S HEALTH, *On Behalf of Itself*, ITS STAFF, PHYSICIANS AND PATIENTS; PLANNED PARENTHOOD CENTER FOR CHOICE, *On Behalf of Itself*, ITS STAFF, PHYSICIANS, AND PATIENTS; PLANNED PARENTHOOD OF GREATER TEXAS SURGICAL HEALTH SERVICES, *On Behalf of Itself*, ITS STAFF, PHYSICIANS, AND PATIENTS; PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER, *On Behalf of Itself*, ITS STAFF, PHYSICIANS, AND PATIENTS; ALAMO CITY SURGERY CENTER, P.L.L.C., *On Behalf of Itself*, ITS STAFF, PHYSICIANS, AND PATIENTS, *doing business as* ALAMO WOMEN'S REPRODUCTIVE SERVICES; SOUTHWESTERN WOMEN'S SURGERY CENTER, *On Behalf of Itself*, ITS STAFF, PHYSICIANS, AND PATIENTS; CURTIS BOYD, M.D., ON HIS OWN BEHALF AND ON BEHALF OF HIS PATIENTS; JANE DOE, M.D., M.A.S., ON HER OWN BEHALF AND ON BEHALF OF HER PATIENTS; BHAVIK KUMAR, M.D., M.P.H., ON HIS OWN BEHALF AND ON BEHALF OF HIS PATIENTS; ALAN BRAID, , M.D., ON HIS OWN BEHALF AND ON BEHALF OF HIS PATIENTS; ROBIN WALLACE, M.D., M.A.S., ON HER OWN BEHALF AND ON BEHALF OF HER PATIENTS,

*Plaintiffs—Appellees*,

*versus*

KEN PAXTON, ATTORNEY GENERAL OF TEXAS, IN HIS OFFICIAL CAPACITY; SHAREN WILSON, CRIMINAL DISTRICT ATTORNEY FOR TARRANT COUNTY, IN HER OFFICIAL CAPACITY; BARRY JOHNSON, CRIMINAL DISTRICT ATTORNEY FOR MCLENNAN COUNTY, IN HIS OFFICIAL CAPACITY,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Texas,
USDC No. 1:17-CV-690

Before STEWART, DENNIS, and WILLETT, *Circuit Judges*.[1]

JAMES L. DENNIS, *Circuit Judge*:

This appeal concerns the constitutionality of Texas Senate Bill 8 ("SB8" or "the Act"), a statute that requires a woman to undergo an additional and medically unnecessary procedure to cause fetal demise before she may obtain a dilation and evacuation (D&E) abortion, the safest and most common method of second trimester abortions. A number of licensed abortion clinics and physicians that provide abortion care services challenged that law, arguing that it would impose an undue burden on a woman's right to obtain an abortion before fetal viability in violation of the Fourteenth Amendment's Due Process clause. The district court agreed, declared the Act facially unconstitutional, and permanently enjoined its enforcement. The State appealed. Because SB8 unduly burdens a woman's constitutionally-protected right to obtain a previability abortion, we AFFIRM.

**I.**

In Texas and nationwide, a D&E abortion is the most common method of abortion after the first 15 weeks of pregnancy, as measured from a woman's last menstrual period (LMP).[2] As its name suggests, D&E is a two-

---

[1] Judge Willett dissents and will file a forthcoming dissenting opinion.

[2] The gestational age of a fetus is measured by the time elapsed since the woman's last menstrual period (LMP). A woman's pregnancy is also commonly separated into three trimesters. The first trimester runs from the first through twelfth week and the second trimester runs from the thirteenth through twenty-sixth week. *See Stenberg v. Carhart*, 530 U. S. 914, 923-25 (2000). The third trimester begins the twenty-seventh week and continues through the end of the pregnancy.

No. 17-51060

step procedure.  First, in the dilation stage, a physician dilates a woman's cervix.    Second, during the evacuation stage, the physician uses a combination of suction, forceps, or other instruments to remove the fetus through the dilated cervical opening.  Because at 15 weeks LMP the fetus is larger than the dilated cervical opening, the fetal tissue usually separates as the physician moves it through the cervix, resulting in fetal demise.  This stage takes approximately ten minutes.

On May 26, 2017, the Texas legislature enacted the abortion regulation SB8.[3]  *See* Act of May 26, 2017, 85th Leg. R.S., ch. 441, § 6, 2017 Tex. Gen. Laws 1164, 1165–67 (eff. Sept. 1, 2017) (codified as TEX. HEALTH & SAFETY CODE §§ 171.151–.154).  Relevant here, the Act states:

> A person may not intentionally perform a dismemberment abortion unless the dismemberment abortion is necessary in a medical emergency.[4]

*Id.* § 171.152.  A "dismemberment abortion" is defined as:

> an abortion in which a person, with the purpose of causing the death of an unborn child, dismembers the living unborn child and extracts the unborn child one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors, or a similar instrument that, through the convergence of two rigid levers, slices, crushes, or grasps, or performs any

---

[3] The statute also contains other abortion-related regulations, including requiring fetal burial.  This appeal pertains only to the law's provision concerning the D&E procedure.

[4] A "medical emergency" is defined as:

life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that, as certified by a physician, places the woman in danger of death or a serious risk of substantial impairment of a major bodily function unless an abortion is performed.

*Id.* § 171.002.

> combination of those actions on, a piece of a the unborn child's
> body to cut or rip the piece from the body.

*Id.* § 171.151.  Though SB8 does not use the term "dilation and evacuation" or "D&E," the parties do not dispute that the Act applies to a D&E abortion. Because fetal tissue separates as a physician removes it from the uterus during the D&E procedure, SB8 prohibits such abortions unless the physician first ensures fetal demise *in utero*—an invasive, additional step that is not part of the D&E procedure.  The Act thus requires an abortion provider performing a D&E to carry out an extra, otherwise unnecessary procedure in the woman's body to bring about fetal demise.  A medical provider who fails to comply with the law is subject to criminal penalties.  *See id.* § 171.153.

Plaintiffs are eight licensed abortion clinics and three abortion providers who challenged SB8 in federal court, contending that it places an undue burden on a woman seeking a previability abortion.  Defendants are Texas law enforcement officers acting in their official capacity (collectively, "the State").  They respond that the Act does not impermissibly restrict abortion access because there are procedures that cause fetal death *in utero* that must be used in addition to D&E to ensure an SB8-compliant abortion. Plaintiffs in rebuttal argue that the additional procedures place a substantial obstacle to a woman's right to a second trimester D&E abortion.

In August 2017, the district court granted a temporary restraining order enjoining the law's enforcement.  The parties then agreed to forego a decision on a preliminary injunction and proceed instead to a trial on the merits.  In November 2017, the court held a five-day bench trial during which it heard testimony from nineteen witnesses, including both sides' medical experts.  Later that month, the court issued extensive findings of fact and concluded that SB8 imposed an undue burden on a large fraction of Texas women seeking a D&E abortion after 15 weeks LMP.  Accordingly, the

No. 17-51060

district court declared SB8 facially unconstitutional and permanently enjoined its enforcement. Defendants timely appealed.[5]

## II.

We review the district court's decision to permanently enjoin enforcement of SB8 for abuse of discretion. *See Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 270 (5th Cir. 2019). The court's underlying conclusions of law are reviewed *de novo*. *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015). Its findings of fact, on the other hand, are reviewed for clear error. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 573-74. And "[w]hen findings are based on determinations regarding the credibility of witnesses, [Federal] Rule [of Civil Procedure] 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575.

---

[5] Oral argument was held in November 2018. In March 2019, the court held this case in abeyance pending the Supreme Court's resolution of *June Medical Servs. L.L.C. v. Russo*, 140 S. Ct. 2103 (2020). Following the Court's decision in *June Medical*, we ordered supplemental briefing from the parties on the effect, if any, of that case on this appeal. In addition, the State moved for a stay of the district court's injunction pending appeal. A two-member majority of this panel denied the motion with one panelist in dissent. *See Whole Woman's Health v. Paxton*, 972 F.3d 649 (2020).

No. 17-51060

### III.

Since the Supreme Court's landmark decision nearly fifty years ago in *Roe v. Wade*, 410 U.S. 113 (1973), it has been clear that the Fourteenth Amendment guarantees a woman's right to choose to undergo a previability abortion. *See Roe v. Wade*, 410 U.S. 113 (1973). Two decades after *Roe*, in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 846 (1992) (plurality opinion), the Court reaffirmed *Roe*'s "essential holding," further dividing it into a three-part legal framework:

> First is a recognition of the right of the woman to choose to have an abortion before [fetal] viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.

*Casey*, then, "struck a balance." *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007). It protected, on the one hand, a woman's right to "mak[e] the ultimate decision to terminate her pregnancy." *Casey*, 505 U.S. at 879. On the other hand, it recognized that the state may enact previability regulations designed "to further the health or safety of a woman seeking an abortion" or "to express profound respect for the life of the unborn" so long as those regulations do not create "a substantial obstacle to the woman's exercise of the right to choose." *Id.* at 877-78. The State asserts here that SB8 advances its interests in "protecting unborn life" and promoting the integrity and ethics of the medical profession. The Court has acknowledged that "[t]he [state] may use its voice and its regulatory authority to show its profound respect for

6

the life within the woman." *Gonzales*, 550 U.S. at 157. And "[t]here can be no doubt the [state] has an interest in protecting the integrity and ethics of the medical profession." *Id.* (internal quotation marks omitted).

However, even when a state statute "furthers the interest in potential life or some other valid state interest," that statute "cannot be considered a permissible means of serving its legitimate ends" if it erects a "substantial obstacle in the path of a woman's choice." *Casey*, 505 U.S. at 877. The "shorthand" for a substantial obstacle is an undue burden. *Id.* Just a few years ago in *Whole Woman's Health v. Hellerstedt*, the Court confirmed that the undue burden "rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." 136 S. Ct. 2292, 2309 (2016) (citing the *Casey* Court's balancing of a law's benefits against its burdens).

The Supreme Court issued its most recent ruling explaining and applying the undue burden last Term in *June Medical Services, L.L.C. v. Russo*, 140 S. Ct. 2103, 2114 (2020). In that case, a 4-1-4 Court invalidated a Louisiana law that imposed an admitting-privileges requirement on abortion providers because the law imposed an undue burden on a woman's right to obtain an abortion. *Id.* at 2112-13. The four Justice plurality applied the balancing approach elucidated in *Whole Woman's Health*, weighing the statute's asserted benefits against its burdens. *See id.* at 2121-32. In a solo opinion concurring in the judgment, Chief Justice Roberts rejected the balancing test, stating that the undue burden test requires looking only to the burdens of an abortion regulation. *See id.* at 2136-37 (Roberts, C.J., concurring in the judgment). The dissenters also repudiated *Whole Woman's Health*'s "cost-benefit standard." *See id.* at 2182 (Kavanaugh, J., dissenting) (observing that the dissenters and concurrence disavowed the balancing test).

The parties dispute *June Medical*'s import. In supplemental briefing ordered after that decision, the State contends that because Chief Justice

Robert's concurrence is the narrowest opinion necessary to *June Medical*'s overall holding invalidating the Louisiana law, it thus provides the controlling formulation of the undue burden test.  Conversely, Plaintiffs maintain that the Court's split decision supplies no such precedential rule on the undue burden test and therefore *Whole Woman's Health*'s balancing test still governs.

For reasons provided more fully in our order denying the State's stay motion, we agree with Plaintiffs. *See Whole Woman's Health*, 972 F.3d at 652-53.  In brief, the issue turns on application of the rule in *Marks v. United States*, 430 U.S. 188 (1977).  "Ordinarily, '[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgment[ ] on the narrowest grounds.'"  *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013) (first alteration in original) (quoting *Marks*, 430 U.S. at 193)).  *Marks* makes clear that the views of dissenting Justices are irrelevant to determining the holding of the Court.  Moreover, we have held that the *Marks* "principle . . . is only workable where there is some 'common denominator upon which all of the justices of the majority can agree.'"  *Id.* (quoting *United States v. Eckford*, 910 F.2d 216, 219 n.8 (5th Cir. 1990)).  And when a concurrence does not share a "common denominator" with, or cannot "be viewed as a logical subset of," a plurality's opinion, it "does not provide a controlling rule" that establishes or overrules precedent.  *Id.*

In *June Medical*, four dissenters agreed with the rule of decision advocated by the Chief Justice, but because they did not concur in or contribute in any respect to the judgment, but instead dissented therefrom, their votes cannot be counted as forming a holding of the Court.  Further, though the plurality and concurrence shared an overall conclusion that the challenged statute constituted an undue burden, they disagreed on how to frame and

apply the undue burden test that led to that determination. Specifically, they disputed whether the test requires a comparative analysis or concerns only a law's burdens without regard to its asserted benefits. *Compare* 140 S. Ct. at 2132 (plurality opinion), *with id.* at 2141-42 (Roberts, C.J., concurring in the judgment). In this case, the concurrence cannot "be viewed as a logical subset of the" plurality's opinion. *Duron-Caldera*, 737 F.3d at 994 n.4. That is because accounting only for a law's burdens renders it impossible to perform a balancing test, which necessarily entails weighing two sides against each other. In other words, the plurality's and concurrence's descriptions of the undue burden test are not logically compatible, and *June Medical* thus does not furnish a controlling rule of law on how a court is to perform that analysis. *See id.*; *see also Eckford*, 910 F.2d at 219 n.8. Instead, *Whole Woman's Health*'s articulation of the undue burden test as requiring balancing a law's benefits against its burdens retains its precedential force.[6] *See* 136 S. Ct. at 2309.

The State claims, however, that *Whole Woman's Health*'s balancing test is limited to health-related regulations and does not apply when, as here, it invokes its legitimate interest in promoting respect for unborn life. True,

---

[6] The Eighth Circuit has come to a contrary conclusion, holding that Chief Justice Robert's separate opinion in *June Medical* is controlling because his vote was necessary to enjoining Louisiana's admitting-privileges law. *See Hopkins v. Jegley*, 968 F.3d 912, 915 (8th Cir. 2020). Though the Eighth Circuit cited *Marks*, it did not provide any interpretation of the *Marks* rule. We, however, are bound to apply our Circuit's construction of *Marks*, which entails determining whether the concurrence shares a common denominator with or can be viewed as a logical subset of the plurality opinion. *See Duron-Caldera*, 737 F.3d at 994 n.4.; *Eckford*, 910 F.2d at 219 n. 8. Because the Eighth Circuit did not mention—let alone apply—such an analysis, its holding is not persuasive and does not affect our decision. Further, the Eight Circuit observed that, when the views of Chief Justice Roberts and the dissenters were combined, a total of five Justices rejected the balancing test articulated in *Whole Woman's Health*. But by definition, dissenters do not concur in the judgment of the court but dissent therefrom; therefore, they are not members "who concurred in the judgment," and their views cannot be considered in determining the Court's holding. *Marks*, 430 U.S. at 193.

No. 17-51060

*Whole Woman's Health* considered statutes that purportedly protected women's health. *See id.* at 2310. But the balancing test dates back to *Casey*, and neither it nor *Whole Woman's Health* suggest that the undue burden standard changes based on the kind of state interest asserted. To the contrary, the Court's cases describe a unitary standard that applies regardless of the type of a state's claimed interests. *See, e.g.*, *Casey*, 505 U.S. at 877 ("[A] statute which, while *furthering the interest in potential life or some other valid state interest*, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends."). In *Casey*, for example, the Court applied the same undue burden standard to all of the regulations it reviewed, including parental and spousal consent provisions that were designed to further the state's interest in potential life. *See id.* at 898-99; *Whole Woman's Health*, 136 S. Ct. at 2309 (expressly stating that *Casey* performed a "balancing" test with respect to both of these provisions). It is unsurprising, then, that the State's argument that the undue burden changes based on the state interest asserted has been rejected by every other court that has considered the issue. *See, e.g.*, *EMW Women's Surgical Ctr. P.S.C. v. Friedlander*, 960 F.3d 785, 796 (6th Cir. 2020) ("Like other courts presented with this argument, we find it unpersuasive."); *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1326 (11th Cir. 2018) ("The State cites no support for the proposition that a different version of the undue burden test applies to a law regulating abortion facilities."). The State's argument in favor of creating an additional, novel undue burden test is inconsistent with the Supreme Court's cases, and we therefore dismiss it. *See Casey*, 505 U.S. at 898-99; *Whole Woman's Health*, 136 S. Ct. at 2309.

We proceed, then, to apply to SB8 the undue burden test in accordance with how it was explained and performed in *Whole Woman's Health*.

No. 17-51060

## IV.

An undue burden, we reiterate, exists when "a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. We first note that, despite a law's possible benefits, the Supreme Court has repeatedly determined that a statute that would effectively ban the safest, most common method of second trimester abortion imposes an undue burden. *See, e.g.*, *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 77-79 (1976) (invalidating a law that barred the then-"most commonly used" method of second trimester abortion); *Stenberg v. Carhart*, 530 U.S. 914, 938-39, 945-46 (2000) (holding unconstitutional a state law that, though it aimed to ban the "D&X" abortion procedure,[7] was written so broadly that it prohibited D&E abortions, too, which were "the most commonly used method for performing previability second trimester abortions"); *Gonzales v. Carhart*, 550 U.S. 124, 153, 165 (2007) (holding that the federal "Partial-Birth Abortion Act," 18 U.S.C. § 1531, which banned the D&X procedure, did "not construct a substantial obstacle to the abortion right," because the D&E procedure—the "most commonly used and generally accepted method" of second trimester abortions—remained available). Thus, if SB8 amounts to a prohibition on the D&E procedure, then it necessarily creates an undue burden on a woman's "effective right" to choose a previability abortion. *Casey*, 505 U.S. at 846.

The State insists that SB8 does not constitute an undue burden because several "alternative methods" of causing fetal demise are available and

---

[7] The D&X procedure, also known as intact D&E, involves dilating the cervix enough to remove the fetus intact. This procedure is banned under the Federal Partial-Birth Abortion Ban Act of 2003, unless fetal demise is induced before the procedure. *See* 18 U.S.C. § 1531; *Gonzales v. Carhart,* 550 U.S. 124 (2007) (upholding federal partial-birth abortion ban).

safe. Sister Circuits that have addressed challenges to substantially similar fetal demise statutes have determined that the methods of fetal demise that the State proposes here are not safe, effective, or available. *See EMW Women's Surgical Ctr. P.S.C.*, 960 F.3d at 807-08; *W. Ala. Women's Ctr.*, 900 F.3d at 1324-28; *see also Glossip v. Gross*, 576 U.S. 863, 882 (2015) ("Our review is even more deferential where, as here, multiple trial courts have reached the same finding, and multiple appellate courts have affirmed those findings."). Those courts thus held that the statutes at issue imposed an undue burden. Although we ultimately reach the same conclusion about SB8 based on our independent analysis, the holdings of other Circuits bolster our confidence that SB8 sets a substantial obstacle in the path of women seeking abortions.

Before examining the district court's findings on the State's proffered methods of fetal demise, we observe that there is a "fundamental flaw" in the State's description of these procedures as "alternatives." *EMW Women's Surgical Ctr. P.S.C.*, 960 F.3d at 798. "Fetal-demise procedures are not, by definition, *alternative* procedures," because a patient who endures such a procedure "must still undergo the entirety of a standard D&E. Instead, fetal-demise procedures are *additional* procedures. Additional procedures, by nature, expose patients to additional risks and burdens. No party argues that these procedures are necessary or provide any medical benefit to the patient." *Id.*; *see also, e.g.*, *Danforth*, 428 U.S. at 78-79 (invalidating an abortion restriction that "force[d] a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed"); *W. Ala. Women's Ctr.*, 900 F.3d at 1326 (noting the State's concession that fetal demise procedures "would *always* impose some increased health risks on women"); *Planned Parenthood of Cent. N.J. v. Verniero*, 41 F. Supp. 2d 478, 500 (D.N.J. 1998), *aff'd sub nom. Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127 (3d Cir. 2000) ("By relegating physicians to the

performance of more risk-laden abortion procedures, the Act imposes an undue burden on the woman's constitutional right to terminate her pregnancy.").

## A.

With this background, we address the three additional procedures the State proposes for causing fetal demise in utero: (1) injecting digoxin into the fetus or amniotic fluid; (2) injecting potassium chloride directly into the fetal heart; and (3) transecting the umbilical-cord. The district court found each of these methods to be unfeasible.

## 1.

The first procedure for causing *in utero* fetal demise that the district court considered was injection of the chemical digoxin into the fetus or amniotic fluid. This method requires a physician to insert a surgical needle approximately four inches in length through the patient's skin, abdomen, and uterine muscle, all without the aid of anesthesia. It is painful and invasive. Generally, physicians wait twenty-four hours after the injection before attempting the evacuation phase of a D&E, thereby requiring a patient to make an additional trip to the clinic one day before her appointment for the D&E procedure. Digoxin, moreover, fails to induce fetal demise about 5-10% of the time, with its effectiveness dependent on variables such as uterine and fetal positioning.

The district court observed that most studies in the record concerning digoxin injections focus on pregnancies at or after 18 weeks LMP, with only a few studies including cases at 17 weeks LMP. No study considered the efficacy, dosage, or safety of injecting digoxin into women before 17 weeks LMP. In light of this, the district court found that requiring digoxin injections before 18 weeks of pregnancy would subject women to an arguably experimental procedure without any counterbalancing benefits. And even when administered successfully after 18 weeks LMP, digoxin injections carry

significant health risks as compared to a D&E procedure performed before fetal demise is ensured, including a heightened risk of infection, hospitalization, and extramural delivery—the unexpected and spontaneous expulsion of the fetus from the uterus while the woman is outside of a clinical setting and without the aid of a medical professional.

Based on the pain and invasiveness of the procedure, the delay in care and logistical difficulties it necessitates, its unreliability, the unknown risks for women before 18 weeks LMP, and the risk of complication, the court found that digoxin is not a safe and viable method of inducing fetal demise before the evacuation phase of a D&E abortion.

The State challenges these findings, claiming that digoxin injections are unquestionably safe. The State essentially asks us to relitigate the district court's factual findings. But as an appellate court, even if we disagreed with the findings below, we cannot reverse them so long as they are based on one of two "permissible views of the evidence." *Anderson*, 470 U.S. at 573. The district court's findings satisfy this standard. The record evidence shows that digoxin injections indeed carry health risks for the pregnant woman, including a study demonstrating that digoxin injections are six times more likely to result in hospitalization as compared to injection with a placebo. The dangers of the procedure were further corroborated by the testimony of expert witnesses. *See Guzman*, 808 F.3d at 1036. In short, we see no error, clear or otherwise, in the district court's determination that digoxin injections are not a safe and feasible method of inducing fetal demise.

**2.**

Next, the district court assessed inducing fetal demise *in utero* through injections of potassium chloride. The procedure requires inserting a long surgical needle through a woman's abdomen and uterine muscles and into the fetal heart. Because at 15 weeks LMP the fetal heart is very small—the

size of a dime—the procedure demands great technical skill on the part of the provider. For the patient, the procedure is painful and invasive.

The injections are also exceeding rare because they carry severe risks for a woman; complications, including death, can result if the solution is injected in the wrong place. Because of the risks inherent with transabdominal injections, this procedure increases the risk of uterine perforation and infection. And no study exists on the efficacy or safety of the injection when administered before the evacuation phase of a D&E. The court thus determined that potassium chloride injections are an unnecessary and potentially harmful medical procedure with no counterbalancing medical benefit for women.

The court also explained that the training necessary to perform the procedure is generally available only to subspecialists in the field of high-risk obstetrics called maternal-fetal medicine. It would be "virtually impossible," the court found, for all physicians at abortion clinics in Texas to receive the requisite training in order for the procedure to be a meaningfully available method of fetal demise. Considering this evidence, the court found that potassium chloride injections are not a safe and workable method of inducing fetal demise.

Again, the State takes issue with the district court's findings. In particular, the State cites the testimony of a maternal-fetal medicine specialist, Dr. Berry, who has used potassium chloride to cause fetal demise. That one physician in a highly-skilled subspecialty may be able to perform the procedure does nothing to refute the district court's findings that, as a practical matter, there are not a sufficient number of physicians trained in the procedure to make it meaningfully available. Nor does it bear on the district court's finding—of which it noted there was "no credible dispute"—that the procedure carries severe risks. And it is undisputed that the procedure carries no

medical benefit for female patients. On this record, we cannot say that the district court's findings are "implausible." *Anderson*, 470 U.S. at 573.

**3.**

Last, the court reviewed the State's contention that umbilical cord transection is a viable method of inducing fetal demise. To perform this procedure, the physician dilates a woman's cervix such that instruments can be passed through to transect the cord. Guided by ultrasound, the physician then punctures the amniotic membrane, inserts an instrument into the uterus, grasps the umbilical cord, and cuts the cord with a separate instrument. The physician then waits for fetal heart activity to cease—usually within ten minutes—and then performs the evacuation phase of the D&E procedure.

The court found that this procedure is not a safe and feasible method of fetal demise for four reasons. First, the procedure is very difficult to perform, particularly if the umbilical cord is blocked by the fetus. Second, the court found that a lack of research on the risks associated with the procedure renders it essentially experimental. Third, cord transection carries significant health risk to the patient, including blood loss, infection, and injury to the uterus. A physician practicing in an outpatient clinic does not have access to blood services for patients at risk of serious blood loss. Fourth, there is insufficient training available to physicians on how to conduct the procedure.

The State also disagrees with these findings, noting that some of the abortion clinics' physicians have performed the procedure. Again though, this observation does not meaningfully address whether the district court's account of the evidence is not "plausible in the light of the record."

*Anderson*, 470 U.S. at 575. We are not persuaded that the court below committed clear error.[8]

### 4.

We summarize the court's overall findings regarding the effect of SB8. Under the statute, all women seeking a second trimester abortion starting at 15 weeks LMP would be required to endure a medically unnecessary and invasive additional procedure that provides no health benefit. The law increases the duration of what otherwise is a one-day D&E procedure. For most women, the length of the procedure would increase from one day to two, adding to the costs associated with travel, lodging, time away from work, and child care. This delay would be particularly burdensome for low-income women, many of whom must wait until the second trimester to seek an abortion because of the time needed to obtain funds to pay for the procedure.

SB8 also forces abortion providers to act contrary to their medical judgment and the best interest of their patient by conducting a medical procedure that delivers no benefit to the woman. And without substantial additional training, the State's proposed fetal-demise methods are not feasible for any physician other than subspecialists in the high-risk field of maternal-fetal medicine.

### B.

Under *Whole Woman's Health*, having reviewed SB8's burdens, we next consider its asserted benefits. First, the State claims that, even if a balancing test applies, SB8 advances its interest in respecting unborn life by protecting it from what the State describes as "the brutality of being

---

[8] The State asserts that suction could be performed before 17 weeks LMP, contending that the district court overlooked this procedure. The court, however, found "adding any additional step to an otherwise safe and commonly used procedure" in of itself led to the conclusion that the State had erected a substantial obstacle in the path of a woman seeking a previability abortion.

dismembered alive." The district court observed that the D&E procedure is "graphic" but did not make any clear findings whether SB8 furthers the State's interest in promoting respect for potential human life. We note that SB8 does not purport to actually prevent the D&E procedure but instead has the effect of requiring invasive procedures to bring about fetal demise before the D&E is performed. Because some may sincerely believe that requiring fetal demise before the D&E procedure advances respect for potential life, we assume without deciding that SB8 provides a limited benefit in this respect. *See EMW Women's Surgical Ctr.*, 960 F.3d at 807.

Second, the State asserts that SB8 advances its interest in ensuring integrity and ethics in the medical profession. However, the Act confers no medical benefit for women patients while forcing them to undergo unnecessary, painful, invasive, and even experimental procedures. Like the district court, we are "unaware of any other medical context that requires a doctor— in contravention of the doctor's medical judgment and the best interests of the patient—to conduct a medical procedure that delivers no benefit to the [patient]." Whatever SB8 arguably may do to advance the State's interest in the medical profession is negated by the Act's forcing of physicians to act contrary to what is best in their medical judgment for their patients.

Third, the State contends that by requiring fetal demise *in utero*, SB8 serves its interest in having patients be informed about the procedures they are to undergo. It claims that Plaintiffs' consent forms do not explain in sufficiently graphic terms what happens to a fetus during a D&E procedure performed before fetal demise and that, by banning such a practice, women will no longer be able to choose this procedure based on a supposed lack of information as to what it entails. But the State's argument that SB8 ensures women are informed about how fetal demise occurs is wholly undermined by the fact that the statute does not require that women receive information on

No. 17-51060

how fetal demise occurs during any of the State's proposed additional procedures to cause fetal demise *in utero*.

Fourth, the State claims that the Act will promote its interest in aligning its laws with those of the international community. That the district court did not discuss this as one of the State's interests is understandable because the Supreme Court itself has never identified this as a valid interest to be considered as part of the undue burden analysis. Moreover, the State's comparative law expert acknowledged that most countries that prohibit second trimester abortions actually ban abortion outright and evidently lack constitutional safeguards for women's reproductive freedoms. Aligning the State's abortion law with that of foreign nations whose reproductive rights laws conflict with the dictates of our Constitution does not serve a valid state interest.[9]

Fifth, the State contends that the law promotes its interest in preventing fetal pain. We find little merit in this argument. Major medical organizations, including the American Medical Association, the American College of Obstetricians and Gynecologists, and the Royal College of Obstetricians and Gynecologists, have concluded that fetal pain is not even possible before at least 24 weeks LMP. Offering a less mainstream view, the State's expert, Dr. Malloy, testified that in her opinion a fetus can feel pain at 22 weeks LMP. But even if Dr. Malloy's opinion were credited, Plaintiffs do not perform abortions at this late time of gestation, and Texas already bans abortion after 22 weeks LMP except in extremely limited circumstances. *See* TEX. HEALTH & SAFETY CODE §§ 171.041-46. Further, the State has not adduced evidence

---

[9] The foregoing should not be construed to suggest that comparative-law perspective cannot serves useful and important functions. Indeed, we readily acknowledge that it can. *See, e.g.*, *Atkins v. Virginia. Texas*, 539 U.S. 304, 316 n.21 (citing international consensus against executing the "mentally retarded"). Here though, the State attempts to use foreign law in an invalid way by asserting that it has an interest in adjusting its laws to more closely reflect those of nations whose laws are incompatible with our fundamental charter.

that requiring doctors to induce fetal demise in utero would be more likely to prevent any purported fetal pain than permitting the D&E procedure without first ensuring fetal demise. The State thus has not demonstrated that SB8 actually advances any interest in preventing fetal pain.

## C.

Weighing SB8's significant burdens upon female patients against its nonexistent health benefits and any other limited benefits it may actually confer, it is clear that the law places a "substantial obstacle in the path of a woman seeking" a previability abortion.[10] *Casey*, 505 U.S. at 877. Based on the district court's findings—which are not clearly erroneous and to which we therefore must defer—the procedures proposed by the State to ensure compliance with SB8 are themselves substantial obstacles to D&E abortions, a procedure whose availability the Supreme Court has continually cited as essential to guaranteeing women's right to abortion care. *See Stenberg*, 530 U.S. at 938-39, 945-46 (2000); *Gonzales*, 550 U.S. at 153, 165. SB8, then, results in severe burdens as it would effectively prohibit the most common and safest method of abortions in Texas after 15 weeks LMP. And it would inflict a special hardship on low-income women who are often unable to obtain an abortion until this point in their pregnancy. On the other end of the scale are the State's interests advanced by SB8, which are minimal at most. We thus conclude that SB8's burdens substantially outweigh its benefits. The law therefore constitutes an undue burden on a woman's right to obtain

---

[10] The State objects to the district court's comment that an obstacle is substantial if it is "of substance." The State contends that this is an incorrectly lax description of the substantial-obstacle test. We need not pass on the district court's objected to single remark because it was not necessary to or employed in the district court's decision applying correct legal principles to plausible and permissible factual findings based on the record in this case.

a previability abortion and violates the Fourteenth Amendment. *See id.* at 877.

## V.

The State next contends that the district court erred in granting facial relief. "[A]n abortion restriction is facially invalid if in a large fraction of the cases in which it is relevant, it will operate as a substantial obstacle." *Jackson Women's Health Org.*, 945 F.3d at 275-76 (internal quotation marks omitted). "The relevant denominator" in this analysis consists of the class of "women for whom the provision is an actual rather than an irrelevant restriction." *Id.* (internal quotation marks omitted). That category is narrower "than all women, pregnant women, or even women seeking abortions identified by the State." *Id.* (internal quotation marks omitted). The district court determined that because SB8 affects every second trimester D&E procedure in Texas, the class of women for whom SB8 is a relevant restriction is all women between 15-20 weeks LMP who seek an outpatient second trimester D&E abortion. We agree. And the State does not contend otherwise.

We turn, then, to the numerator in this fraction: the portion of women seeking a D&E procedure between 15-20 weeks LMP for whom SB8 is a substantial obstacle. *See id.* SB8 compels *all* women seeking a D&E abortion during this gestational period to undergo an additional and otherwise unnecessary procedure to induce fetal demise. The procedures are dangerous, painful, invasive, and potentially experimental. And they expose all women to heightened risks of adverse health consequences, while offering no corresponding health benefit. Taken together, these burdens are substantial, exceed any minimal benefits from the law, and thus are undue. And because SB8 would subject all women seeking a D&E abortion after 15 weeks LMP to these undue burdens, SB8 operates as a substantial obstacle in a large fraction of cases in which it is relevant. *See Jackson Women's Health Org.*, 945 F.3d at

275-76. Indeed, the law imposes an undue burden on *every* Texas woman for whom it is an actual, rather than irrelevant, restriction.

In an effort to salvage SB8, the State argues that we should limit the scope of injunctive relief by enjoining only the law's unconstitutional applications while leaving intact its purportedly constitutional applications. We reject this argument for several reasons. First, as explained, the district court properly exercised its discretion in granting facial relief. Second, "it is not our role to rewrite an unconstitutional statute." *Jackson Women's Health Org.*, 945 F.3d at 277 n.50 (quoting *United States v. Stevens*, 559 U.S. 460, 481 (2010)); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) ("[M]indful that our constitutional mandate and institutional competence are limited, we restrain ourselves from rewriting state law to conform it to constitutional requirements[.]" (cleaned up)). Third, "we are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg*, 530 U.S. at 944 (internal quotation marks omitted). The State offers no such construction, and we think no such construction is possible because, as explained in our large-fraction analysis, SB8 operates as an undue burden in all of its applications where it is a relevant restriction.

## VI.

For these reasons, we AFFIRM the judgment of district court.